ARKANSAS VALLEY COMPRESS & WAREHOUSE Co. *v.* MORGAN.

4-9133                                                    229 S. W. 2d 133

Opinion delivered April 17, 1950.

162

*Townsend & Townsend* and *House, Moses & Holmes,* for appellant.

*Bailey & Warren,* for appellees.

ED. F. McFADDIN, Justice. The principal question posed by this litigation is the validity of a lease made by the City of Little Rock to the appellant, and covering property known as Building No. 19 near the Municipal Airport. Intertwined are also other questions relating to actions, parties, municipal powers, estoppel, and laches.

The litigation—of which this appeal is the fruition—was initiated by a complaint filed in the Chancery Court on April 2, 1948, by W. S. Morgan, as a citizen and taxpayer of the City of Little Rock. Defendants were Arkansas Valley Compress & Warehouse Company (hereinafter called "Arkansas Valley") and the City of Little Rock (hereinafter called "City"). The complaint alleged that on December 31, 1931, the City leased to White Brothers (now Arkansas Valley) certain lands and a warehouse thereon (hereinafter referred to as Building No. 19); that the lease was illegal and void;[1]

---

[1] The complaint alleged that the said 1932 lease was illegal and void because:

"Plaintiff states that said lease was and is illegal and void, of no effect, and was not binding upon the City of Little Rock nor the citizens of said City of Little Rock including this plaintiff for the rea-

because of constructive fraud; that in 1936 the City and Arkansas Valley amended the original lease but the amendment was also void because of constructive fraud; that Building No. 19 was occupied in 1948 by U. S. Time Corporation and the rental should be paid to the City of Little Rock. The prayer of the complaint was for the cancellation of the lease rights of Arkansas Valley and the receipt by the City of the rentals paid by U. S. Time Corporation.

The City, in its answer, denied that there was any actual fraud connected with the leasing of the property to Arkansas Valley, but admitted that the lease "was an attempted improvident agreement on the part of the City . . .". The City prayed that the Court "grant the relief as prayed in the complaint." Obviously, the effect of this pleading was to array the City on the side of the plaintiff; and this is further demonstrated by the fact that the City is one of the appellees. So we bypass the question of the plaintiff's right to bring the suit. The defendant, Arkansas Valley, after various objections as to parties, etc., filed answer in which it denied all allegations as to fraud or improvidence; affirmatively stated that all contracts had been fairly and legally made; and denied that the City held the property as trustee for the public. By way of cross-complaint, Arkansas Valley claimed that when the Federal Government returned possession of the airport property to the City in 1948, the City failed and refused to return to Arkansas Valley a vacant strip of approximately 72 feet. To this cross-complaint the City pleaded the Statute of Frauds.

---

sons: (1) that the Board of Public Affairs had no power to execute said lease nor did the City of Little Rock have the power to lease properties obtained by it for public purposes for private use; (2) that the consideration therein stated was grossly inadequate to such an extent as to constitute a constructive fraud on the rights of this plaintiff and the citizens of the City of Little Rock; and (3) that the term of said lease was beyond the power of the City to grant and was for such an unreasonable length of time as to constitute an unconscionable and improvident disposition of the property rights of the City and the rights of this plaintiff and other citizens; and (4) that the effect of said attempted lease was that for a half century the City would abdicate its duty as trustee for the public and obligate itself to suspend for the same time all exercise of its legislative and administrative powers of Government as to this property, which was a constructive fraud upon the rights of the citizens of Little Rock."

The cause was tried upon the issues joined. The evidence is voluminous, including 360 pages of testimony and 61 exhibits. The Chancery decree cancelled all rights of Arkansas Valley to Building No. 19, required Arkansas Valley to account to the City for rentals received after September, 1948, and allowed the City to continue receiving future rentals under the sublease to the U. S. Time Corporation.[2] Arkansas Valley has appealed.

Numerous questions are presented in the excellent briefs, but we discuss only those questions essential to a determination of the issues:

I. *The Evidence as to Fraud in the 1932 Lease and 1936 Amendment.* Courts have always been reluctant to define "fraud" (either actual or constructive) lest man's fertile mind invent a new scheme outside the definition but just as nefarious as previously denounced schemes.[3] So most Courts have stated the elements of fraud rather than an all-inclusive definition. In *Mid-Continent Co.* v. *Hill*, 192 Ark. 667, 94 S. W. 2d 364, Mr. Justice MEHAFFY quoted from Black's Law Dictionary as to the elements of fraud:

"Fraud consists of some deceitful practice or willful device resorted to with intent to deprive another of his right or in some manner do him an injury."

---

[2] Among other statements, the decree recites:

"There is no criticism of anybody for obtaining this lease, in the sense that there is no evidence of actual criminal fraud, but the grossly inadequate consideration which defendant, Arkansas Valley Compress & Warehouse Company, pays the City of Little Rock constitutes a constructive fraud upon every citizen of the City; the defendant, Arkansas Valley Compress & Warehouse Company, took an unconscionable advantage of the City officials of Little Rock, who were trustees of municipal properties, in the term of said lease, as well as the grossly inadequate consideration therefor, and this constitutes a constructive fraud upon each and every citizen and taxpayer of the City of Little Rock.

• • •

"The length of the lease from the City of Little Rock . . . is fifty (50) years. This, in effect, alienates highly useful and valuable municipal property for half a century so that the citizens of Little Rock are deprived of their useful enjoyment thereof for an entire generation. City property should not be tied up for such a length of time, because the welfare of a community demands otherwise, and this is another reason why this lease should be set aside and held for naught."

[3] See 23 Am. Jur. 753.

To the same general effect see Bouvier's Law Dictionary:

"Actual or positive fraud includes cases of the intentional and successful employment of any cunning; deception, or artifice, used to circumvent, cheat, or deceive another. 1 Story, Eq. Jur. § 186."

It is not contended that there was any actual fraud in the transactions here involved. The complaint says the dealings were "a constructive fraud on the rights of the citizens of Little Rock." We come then to the matter of constructive fraud, which—while not defined—has been stated to consist of certain elements. In *Levinson* v. *Treadway*, 190 Ark. 201, 78 S. W. 2d 59, Mr. Justice MEHAFFY said:

"Persons, in order to be guilty of legal or constructive fraud, or, as it is sometimes called, fraud at law, do not necessarily have to be guilty of moral wrong, but a constructive fraud is a breach of either legal or equitable duty which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or injure public interests. Neither actual dishonesty of purpose nor intent to deceive, is an essential element of constructive fraud. 26 C. J. 1016 and cases cited."

Bouvier's Law Dictionary says:

"Legal or constructive fraud includes such contracts or acts as, though not originating in any actual evil design or contrivance to perpetrate a fraud, yet by their tendency to deceive or mislead others, or to violate private or public confidence, are prohibited by law."

In *Hildebrand* v. *Graves*, 169 Ark. 210, 275 S. W. 524, Mr. Justice HART pointed out that in determining the question of fraud, all the surrounding circumstances are to be considered. Therefore, we examine the evidence in this case to see whether there was any constructive fraud in connection with the 1932 lease and the 1936 amendment.

The testimony shows that because of World War I, the United States Government [4] owned property in Little Rock known as the "Airport Site" on the west side of which was located Building No. 19, a concrete building, approximately 800 feet long and 300 feet wide, and served by two railroad tracks. In 1929 the United States Government offered to lease to the City of Little Rock the entire airport property, including Building No. 19; but the City declined the offer chiefly because of the obligation of maintaining the building. The United States Government then advertised for bids. White Brothers made the best bid and in 1930 leased [5] from the United States Government the entire airport property, including Building No. 19, for five years, with option to renew for five additional years. Under this lease, White Brothers agreed to pay the United States Government $2,400 per year, *and also agreed to maintain Building No. 19 in good condition.*

Some time after 1930 White Brothers organized the Arkansas Valley Compress and Warehouse Company (*i. e.,* "Arkansas Valley") which assumed all obligations of the lease; and White Brothers and Arkansas Valley, for the purpose of this statement of facts, are identical. In 1930, 1931, and 1932 Arkansas Valley spent, for improvements on and maintenance of Building No. 19, a sum of approximately $40,000, and the building was used as a cotton compress and warehouse until World War II.

When Arkansas Valley became the owner of the lease in 1930, it had no need for any of the property, except Building No. 19 and some land contiguous, so Arkansas Valley subleased the airport to the. City of Little Rock for an annual rental of $3,000 a year. It will be observed that the City had refused to lease all the property from the Federal Government because it did

---

[4] In some places it is referred to as the War Department; in others the Bureau of Aeronautics; but, in all events, the property was that of the United States Government; and the various departments of the Federal Government are treated as the United States Government in this case.

[5] This lease, as well as all other instruments executed by the United States Government and mentioned in this opinion, gave the Government the right to resume possession of all the property in the event of war, or other national emergency.

not want to be obligated to repair and maintain Building No. 19, but the City was willing to pay $3,000 a year for the airport.

This arrangement between Arkansas Valley and the City continued until 1931 when the City and Arkansas Valley agreed—subject to approval of the United States Government—to a different arrangement which was considered, at that time, to be beneficial to both Arkansas Valley (because it obtained a longer lease than its original ten year lease) and the City (because it would be out less money for the lease of the airport). The United States Government acquiesced in the new agreement; and the result was that the City, on December 31, 1931, made "the 1932 lease" which is under attack in this suit. This lease provided:

(a)—That Arkansas Valley would surrender its lease to the United States Government on all the airport property, including Building No. 19;

(b)—That the United States Government would then lease all the airport property, including Building No. 19, to the City of Little Rock for twenty-five years, with a renewal option for an additional twenty-five years;

(c)—That the City would pay the United States Government rental of $1,200 per year for nine years, and $1.00 per year thereafter;

(d)—That the City would lease Building No. 19 and a 72 foot contiguous strip to Arkansas Valley for twenty-five years, with right of renewal for an additional twenty-five years; and that the rental paid by Arkansas Valley to the City would be $600 per year for nine years and $1.00 per year thereafter; and

(e)—That Arkansas Valley, as lessee, "shall at its expense, repair and maintain in good condition and working order, and in a manner satisfactory to the Chief of the Air Corps, or other competent military authorities, Building No. 19 in its entirety, and the lessee shall at its expense put on Building No. 19 a new roof of the type now existing thereon whenever, in the opinion of the Sec-

retary of War, a new roof is required, all work here-under to be done under the general supervision and subject to the approval of the competent military authorities. . . .''

Was there any constructive fraud in this lease? The City had been paying $3,000 a year for the airport, and through the beneficence of the Federal Government and the influence of the Arkansas Congressional Delegation, the City was enabled to reduce its annual rent payments on the airport to $600 per year for nine years, and $1.00 per year thereafter. The City certainly improved its position by this 1932 contract. It is now claimed that Building No. 19 had a much greater rental value in 1932 than the $600 per year that Arkansas Valley agreed to pay. That is questionable. Those who represented the City in 1932 and 1933, when all the banks were closed, said *at that time* that the City was materially benefiting itself by the 1932 agreement.

In all that the City did in executing the 1932 contract, there was a full observance of all legal requirements; and, furthermore, there was the spotlight of publicity on all the negotiations and also on the final terms of the 1932 contract. Headline stories in Little Rock newspapers gave the terms of the 1932 agreement, and also its advantages to the City. These newspaper articles were introduced in evidence in this trial. We quote from one newspaper article which appeared under a headline of December 23, 1931:

''Formal approval was given by the City Council to leases between the City and the War Department, and the City and White Brothers,[6] a cotton firm, for part of the municipal airport property, at a meeting yesterday afternoon. . . . The leases, which will supplant the existing leases controlling the section of the airport owned by the Government, will become effective January 1, and it is expected they will save the City more than $30,000 over a period of nine years. The City will lease the property from the Government and will sublease part

[6] As previously stated, White Brothers and Arkansas Valley are considered identical in the statements herein.

of a large warehouse to White Brothers for twenty-five years. The aldermen spent more than an hour studying the leases yesterday, and Mayor Knowlton said he was convinced the leases are as nearly perfect as possible. The Mayor has been working on the leases for several months. . . .''

The 1932 lease agreement was duly recorded, and continued to govern the parties, until some time in 1936, when a Bill was introduced in the United States Congress, by the terms of which the Government proposed to cancel the 1932 lease and transfer to the City of Little Rock *the title to all of the airport property, including Building No. 19;* but in addition to the usual provision (giving the Government the right to resume possession of the property in the event of war or other national emergency), there was a further provision that prohibited the City from subleasing Building No. 19 or any other part of the airport property. The effect of this Bill would have been to impose on the City of Little Rock all the maintenance cost on Building No. 19, including the sprinkler system. Because of the provision against subleasing, the City and Arkansas Valley persuaded the Arkansas Congressional Delegation (which worked untiringly at all times) to have the pending Bill amended; and this was done, with the result that the City of Little Rock received a deed to all of the airport property and in addition, the City was given the right to sublease Building No. 19 to the Arkansas Valley. The deed from the United States Government to the City of Little Rock was dated July 15, 1936; and the new rental agreement between the City and Arkansas Valley provided that, beginning on that date, Arkansas Valley would pay the City as rent for Building No. 19 and the 72 foot contiguous strip the sum of $3,000 per year for 10 years and $2,500 per year thereafter. All other provisions in the 1932 lease continued in full force, including Arkansas Valley's obligation to maintain and repair Building No. 19.

Thus by the 1936 amendment the City materially improved its position over the 1932 lease: instead of receiving only $600 per year for the remaining four years and

$1.00 per year thereafter, the City was to receive as rent from Arkansas Valley $3,000 a year for ten years and $2,500 per year thereafter. But for the amendment sponsored by the Arkansas Delegation, at the request of the City and Arkansas Valley, the City could not have subleased Building No. 19. The full terms of the 1936 agreement were publicly stated in front page articles in local newspapers. Not only was there an absence of concealment: instead there was public acclaim to those who had represented the City.

We have given in considerable detail the facts and circumstances surrounding the 1932 and 1936 leases, because in none of these facts and circumstances do we detect the slightest evidence of any species of fraud. The evidence offered by the taxpayer in this case was to the effect that Building No. 19 had a much greater rental value in 1936 than $3,000 per year. Saying in 1949 that property had a greater rental value in 1936 (than the parties agreed to) is putting "hindsight in front of foresight." The length of time of the lease may now seem improvident; but we cannot say, in the light of 1932 and 1936, that the City acted improvidently. Even so, mere improvidence is vastly different from constructive fraud; and we find an entire absence of any kind of fraud in the negotiations and contracts mentioned herein.

II. *The Right of the City to Cancel the Lease in the Absence of Fraud.* The appellees, Morgan and the City, insist that—because of the length of time for which the property was leased, the cheap rental of only $3,000 a year, and the present rental of $58,000 per year—the City should have the right to cancel the lease of Arkansas Valley, so the City could receive the net rent from the U. S. Time Corporation. But these matters involve a consideration of the function in which the City acted in dealing with Arkansas Valley and the sanctity of contracts made by a City. The situation in the case at bar is strikingly similar to that in the reported case of *Town of Searcy* v. *Yarnell,* 47 Ark. 269, 1 S. W. 319, which we now review:

In 1871 the Town of Searcy desired to have a railroad to run from Searcy and connect with the Cairo & Fulton Railroad (now Missouri Pacific system) at Kensett. So there was organized a corporation styled "The Searcy Branch Railroad Company" and the Town of Searcy paid for and owned all of the $20,000 of stock of that corporation. In 1877 the Town of Searcy sold the Searcy Branch Railroad to Yarnell for $500 cash and the further consideration that Yarnell would extend the railroad five miles, make substantial improvements, and continue operation. Yarnell performed the promised consideration and expended almost $30,000 in so doing. Then, in 1882, the Town of Searcy instituted suit to cancel the sale of the railroad to Yarnell, and claimed, *inter alia,* that Searcy had never consented to the sale and that Yarnell, "by reason of his position and influence, gained an undue advantage over the town, and that the town was powerless to assert her rights" until the filing of the suit in 1882. In denying the attempt of the Town of Searcy to cancel the 1877 sale to Yarnell, this Court said:

". . . A municipal corporation may be the owner of two classes of property. One class includes all property essential to, or even convenient for, the proper exercise of municipal functions and corporate powers. The other class includes all property held for general convenience, pleasure, or profit. It is needless to inquire into the extent of the rights and powers which a municipal corporation has in and over property of the first-named of these classes. It may well be admitted that such an inquiry would involve grave doubts. But the Searcy Branch Railroad, and all its property and franchises, belonged to the second class, and our inquiry is solely as to that . . . 'Powers granted for private advantages, though the public may also derive benefit therefrom, are to be regarded as exercised by the municipality as a private corporation;' and 'municipal corporations in their private character, as owners or occupiers of property, are regarded as individuals.' . . . The contract of sale being otherwise fair and lawful, both parties having performed their respective parts, the plea of

*ultra vires* cannot and ought not in equity and good conscience, to avail anything. See *Hitchcock* v. *Galveston,* 96 U. S. 341, 24 L. Ed. 659; and *Union National Bank* v. *Matthews,* 98 U. S. 621, 25 L. Ed. 188.''

The foregoing case clearly recognizes that a city (*i. e.,* a municipal corporation) acts in two capacities (*i. e.* a governmental capacity and a proprietary capacity); and that when it enters into contracts involving, not the Government of its citizens, but only the convenience, pleasure, and profit of the people and the City, then the municipal corporation acts in its *proprietary capacity.* Other cases to the same effect are *Fussell* v. *Forrest City,* 145 Ark. 375, 224 S. W. 745, and *Lester* v. *Walker,* 177 Ark. 1097, 9 S. W. 2d 323. In *McQuillin* on ''Municipal Corporations,'' 3 Ed. Vol. 2, § 10.05, this statement appears:

''A municipal corporation has a two-fold character and dual powers, recognized by the federal courts the same as by state courts. The one is variously designated as public, governmental, political or legislative, in which the municipal corporation acts as an agency of the state. The other is variously designated as municipal, private, proprietary, or the like. Herein the former will be referred to as governmental and the latter as private. . . . Governmental powers and functions have been defined as those conferred on a municipal corporation as a local agency of prescribed and limited jurisdiction to be employed in administering the affairs of the state and promoting the public welfare generally. . . . Private, often referred to as municipal or proprietary, functions and powers are those relating to the accomplishment of private corporate purposes in which the public is only indirectly concerned, and in which the municipal corporation, in their exercise, is regarded as a legal individual. Private functions are those granted for the specific benefit and advantage of the urban community embraced within the corporate boundaries. All functions of a municipal corporation not governmental are said to be strictly private. When acting as a private corporation a municipal corporation may claim its rights and immunities, and is subject to its liabilities.'' (See

also Dillon "Municipal Corporations," 5 Ed. § 109, *et seq.*)

In the case at bar the City of Little Rock, in its dealings concerning Building No. 19, was acting in a proprietary rather than a governmental capacity. The United States Congress,[7] in authorizing the transfer of the property to the City of Little Rock in 1936, required that all the property be used "by the municipality for public purposes, except what is known as Building No. 19 thereon covered by existing lease. . . ." This quoted language constituted Congressional recognition of the fact that the City would use Building No. 19 in a proprietary, rather than a governmental capacity; and the clear effect of all of our cases is that when a situation exists, as in the case at bar, the City, in leasing a building and collecting rent, acts in a proprietary and not a governmental capacity.

When a city makes contracts in its proprietary capacity, the city is bound the same as any private corporation or citizen would be. In *Town of Searcy* v. *Yarnell, supra,* we quoted from *Bailey* v. *Mayor of New York,* 3 Hill 531, 38 Am. Dec. 669.

" 'Powers granted for private advantages, though the public may also derive benefit therefrom, are to be regarded as exercised by the municipality as a private corporation;' and 'Municipal corporations in their private character, as owners and occupiers of property, are regarded as individuals.' "

In 62 C. J. S. 246 this is stated as the general rule:

"In respect of its purely business relations as distinguished from those that are governmental, a municipal corporation is governed by the same rules, and is held to the same standard of just dealing, that the law prescribes for private individuals or corporations, and is clothed with the same full measure of authority over its property that private corporations and individuals enjoy, . . ."

See, also, 37 Am. Jur. 729.

---

[7] See 49 Stat. at L. 1292, 74th Cong. Sess. II, Ch. 404, May 15, 1936.

It is obvious that a private corporation or an individual could not avoid a contract, either on the claim that it was for a long time or that it was for what afterwards proved to be a small consideration. In 9 Am. Jur. 359 the rule is stated:

"Mere inadequacy of price, improvidence, surprise, or hardship, unaccompanied by any element of fraud, mistake, or illegality, or even impossibility of performance, will not, however, furnish basis for interposition of equity by way of cancellation or rescission. Moreover, if parties make contracts upon contingencies uncertain to both, with equal means of information, and there is no fraud, the courts cannot undertake to set such contracts aside. . . ."

And in 12 C. J. S. 970 this appears:

"In the absence of fraud or other inequitable factors a court of equity will not rescind a contract for inadequacy of consideration, improvidence, or hardship."

Some of the cases in which this Court has refused to allow a municipality or a county to rescind a contract on the claim of inadequacy of consideration are: *Little Rock Chamber of Commerce* v. *Pulaski Co.,* 113 Ark. 439, 168 S. W. 848, and *Washington Co.* v. *Lynn Shelton Post,* 201 Ark. 301, 144 S. W. 2d 20.

So in the case at bar, what is said to be an improvident contract in the light of present rental values, must nevertheless stand as a valid contract, else there would never be any sanctity to contracts made by a municipality when acting in a proprietary capacity. The appellees cite and rely on *State* v. *Baxter,* 50 Ark. 447, 8 S. W. 188; but that case is not applicable to the case at bar for several reasons, two of which are: (a) in State v. Baxter actual fraud was shown, whereas no fraud of any kind is shown in the case at bar; and (b) in State v. Baxter the County attempted to dispose of land that it held in trust for a County Court House site. The County, in holding that land, was acting in a governmental capacity, as distinct from a proprietary capacity.

It would unduly extend this opinion to cite and discuss the scores of cases listed in the excellent briefs

in the case at bar. We conclude this section of the opinion by announcing our holding that under the law and evidence in this case, the City is not entitled to cancel the Arkansas Valley lease.

III. *Arkansas Valley's Cross-complaint.* Contiguous to Building No. 19 there is a parcel of ground about 72 feet wide and several hundred feet long. This ground was leased to Arkansas Valley, along with Building No. 19. In 1943 the United States Government proposed to construct a large warehouse on this ground if the City would surrender title and possession of this 72 foot strip. Accordingly, Arkansas Valley released its interest in this strip to the City, conditioned that the City would deed the strip to the United States Government, and the building be constructed. The release of the possession of the strip by Arkansas Valley was thus conditional. The City never deeded the property to the Government, and the proposed building was never constructed; but the City has refused to return the possession of the 72-foot strip to Arkansas Valley. The cross-complaint of Arkansas Valley was to regain possession of the 72-foot strip and against the cross-complaint the City of Little Rock pleaded the Statute of Frauds.

In passing on this cross-complaint the learned Chancellor stated:

"With reference to the cross-complaint filed by the defendant, asking that a strip of about 72 feet and of considerable length be returned to them, this strip was given to the Federal Government by both the City and the defendant with the idea that a large building might be constructed and this ground would be needed. The building did not materialize and in the event the ruling of this court, in regard to the lease, should be reversed, the defendant, Arkansas Valley Compress & Warehouse Company should regain the use of this strip of land."

Since we are reversing the Chancery decree on the main question of the 1932 lease and 1936 amendment, it necessarily follows that Arkansas Valley is entitled to repos-

session of the 72-foot strip; and a decree should be so entered by the Chancery Court.

IV. *Negotiations for Increased Rentals.* During World War II the United States Government took possession of all of the airport property, including Building No. 19, and constructed an additional (*i. e.* second) floor on a portion of Building No. 19. After the United States Government returned the airport property to the City, and the City returned Building No. 19 to Arkansas Valley the City began negotiations with Arkansas Valley for additional rent because of the enlargement of Building No. 19 by the United States Government. While these negotiations were being conducted, the appellee, Morgan, filed this taxpayer's suit which necessarily suspended the correspondence. We presume that the negotiations will be resumed after this litigation is concluded; and we point out that nothing in this opinion is to be considered as an expression concerning the rights of either party in the matter of increased rentals because of enlargement of the building.

## CONCLUSION

The decree of the Chancery Court is reversed and the cause remanded, with directions to enter a decree dismissing the complaint of the plaintiff and the prayer of the City, and awarding Arkansas Valley relief on its cross-complaint.