C. A. BROWN, appellant, v. CITY OF SIOUX CITY, a municipal corporation, appellee.

No. 47967.

(Reported in 49 N.W.2d 853)

November 13, 1951.

Kindig & Beebe, of Sioux City, for appellant.

George F. Davis, city solicitor, of Sioux City, for appellee.

MULRONEY, J.—C. A. Brown sued the City of Sioux City alleging in his petition that in 1948 he rented certain property located at the municipal airport for the purpose of maintaining and establishing colonies of bees thereon; that in August of that year the city was negligent in spraying the air base property with a poisonous substance called chlordane so that his bees were sprayed and the bees picked up the poisonous substance on their bodies and carried it back to the bee colonies with the result that his bees died, his honey was permeated with the poisonous substance and rendered unfit, and the hives also were rendered unfit for further use. His petition alleged that the city operated the Sioux City air base in its proprietary capacity. At the conclusion of the evidence the trial court submitted the questions of defendant's negligence, plaintiff's freedom from contributory negligence, and whether defendant was acting in a governmental or proprietary capacity to the jury. After verdict for plaintiff for $1500 the trial court sustained defendant's motion for judgment notwithstanding verdict on the ground "that the operation of the air base was a governmental function; that the farming operation in connection therewith was but an incident thereto." Plaintiff appeals.

I. Defendant argues, as it had a right to do, that another ground of its motion—insufficiency of the evidence to support the verdict—was good and this would support the trial court's ruling. Since this involves a review of the evidence we

will take it up first and pass for the moment the question of defendant's governmental or proprietary capacity.

Plaintiff has been engaged in the business of handling bees for thirty years. It is admitted by defendant that in the year 1947 plaintiff rented a plot of about three acres of air base property for the purpose of placing beehives thereon at an annual rental of $25. He rented the plot from the air base manager and plaintiff testified he renewed the lease for the year 1948. The defendant denies the renewal, but the evidence on this point amounts to no more than a conflict which, for the purpose of the motion, will be resolved in favor of plaintiff; and it is clear plaintiff was occupying the plot with his hives which were visible from the manager's office during the entire year 1948. There was sufficient testimony to support a finding that a tenant-and-landlord status existed between plaintiff and defendant in August of 1948.

Defendant's answer admits "that the Sioux City air base property was sprayed sometime in August of 1948 with a substance designed to kill grasshoppers." It is established by the evidence that the substance was chlordane. The strips between the runways, which were planted to brome grass and possibly sweet clover, were sprayed by the city and there is evidence that the farmers who rented the farm land in the "approach zone" area of the air base property sprayed their land. There were nine or ten farm tenants who leased their farms from the city and farmed on a fifty-fifty basis. They obtained the chlordane spray from the city warehouse, paying for one half of what they took. Possibly in view of the pleading admission we need not explore the question of whether the farmers were the city's agents in the spraying of the land they occupied. But the evidence as to whether the bees died before or after the farmers sprayed is a little confusing. At one point plaintiff testified "spraying was not done by the tenants on the farm in the summer of 1948." He said he saw the city's jeep-type spray operating within a hundred or two hundred feet of his grove spraying the runways and an old gravel road and that the first time he noticed anything wrong with his bees was right after this spraying. The bees started dying, and plaintiff testified the chlorine in the spray "causes a paralysis and they go in circles like they are drunk." He had his honey tested and the chemist testified it contained a "heavy, abnormal concentra-

tion of chlorine" rendering it unfit for use. This chemist also testified "chlordane is an insecticide that kills insects and bees."

Plaintiff stated the bees have a flight radius of three to four miles but they do not ordinarily go that far—that their "flights generally are in the direction where most of the clover or nectar-bearing plants are situated." He said : "I talked to all the people in the bottom near the flight of the bees and talked with the farmers to see if they were spraying. No one was using chlordane other than the base."

While the evidence is not too clear on some points we believe it was sufficient to warrant a finding that the plaintiff's bees died and the honey was spoiled and the hives damaged by defendant's spraying operation. Most of this evidence was uncontroverted. There is no evidence that defendant sprayed the plot rented by plaintiff. But a cause of action exists in favor of the tenant and against the landlord when the tenant is damaged in his occupation by the landlord's use of the property retained by him. In 51 C. J. S., Landlord and Tenant, section 319, page 995, the rule is stated :

"The landlord is bound not only to take reasonable care in the user of land retained by him not to cause damage to the tenant in his occupation of the part leased, but also to refrain from disturbing the possession and enjoyment of the premises leased by such operations, irrespective of the question of his negligence."

Since the verdict has been eliminated and judgment entered for defendant on direction the question presented is whether there was any view of the case on which plaintiff should have been allowed to go to the jury. In paragraph 10 of plaintiff's petition it is alleged the city was negligent (a) in failing to notify plaintiff of its intention to spray the premises with a poisonous substance, which premises were being worked by the bees, (b) in spraying a poisonous substance on vegetation which was being worked by the bees, and (c) in knowingly depositing poisonous substance which it knew, or by the exercise of reasonable caution should have known, would cause the death of plaintiff's bees. In paragraph 11 plaintiff alleged the city owed a duty to refrain from spreading poison at a time and place when it would injuriously affect property of its tenant without notifying him, so he would

have an opportunity to remove his colonies of bees from the area. Paragraph 12 alleges "that as a result of the acts of negligence and omission as above set forth" plaintiff was damaged. The evidence as to damage, including the loss of bees, equipment and 6000 pounds of honey totaled a valuation of $3700.

The petition here, like the petition in Paltey v. Egan, 200 N. Y. 83, 93 N.E. 267, sets forth a cause of action based on negligence. It may be plaintiff, by his petition, has restricted the landlord's liability. At least it pleads a case based on the landlord's duty to use reasonable care and prudence in the use of the land retained, not to injure the tenant in his use of the premises he rents. We hold the evidence established a cause of action based upon negligence for the consideration of the jury. The case was submitted to the jury on the theory of negligence.

We do not deem it necessary in this case to treat at length the interesting subject of a person's responsibility for the use and control of poisons. General rules pertaining thereto are treated in various texts. Among them are 72 C. J. S., Poisons, section 5. See also S. A. Gerrard Co., Inc. v. Fricker, 42 Ariz. 503, 27 P.2d 678, and Miles v. A. Arena & Co., 23 Cal. App.2d 680, 683, 73 P.2d 1260, 1262. The cited cases involve the loss of bees resulting from the dusting or spraying operation of an adjoining landowner, but in each case there was evidence the dust or spray reached the apiary. They are of some interest here merely because they announce the rule, as stated in the Miles case, "* * * that, in itself, dusting vegetables to kill pests that prey upon them is a necessary and lawful operation which the owner of the vegetables may perform * * *. However, he should not do the dusting, or have it done, under conditions which would indicate to a reasonably prudent person that damage to his neighbor would result."

The relationship of landlord and tenant was not present in the above cases. With that relationship present between the parties the duty of the landlord is, as we have stated, at least a duty to use reasonable care and prudence in his use of the land adjacent to the rented premises, to the end that his tenant be not damaged in his occupancy. 51 C. J. S., Landlord and Tenant, section 323, page 1010; Boyer v. Commercial Bldg. Inv. Co., 110 Iowa 491, 496, 497, 81 N.W. 720, 722; Underhill v. Motes, 158 Kan. 173, 146 P.2d 374; White v. Splawn, 16 Wash.2d 296, 133 P.2d 298.

1202

In the Boyer case the plaintiff who rented a room in defendant's building sued the landlord for damages caused by acts of the latter in the basement heating room that caused the rented premises to become uncomfortable. The opinion holds the one question in the case was: "Did the defendants, after plaintiff took possession, do anything to disturb his [tenant's] possession, or interfere with his enjoyment and use of the premises?" And the opinion goes on to hold: "The landlord, without being guilty of an actual, physical disturbance of the tenant's possession, may yet do such acts as will justify the tenant in leaving the premises. If he does not leave, yet he may have an action for damages. Keating v. Springer [146 Ill. 481, 34 N.E. 805, 22 L. R. A. 544, 37 Am. St. Rep. 175]."

The case of Underhill v. Motes, supra, is much like this case on the facts. There defendants leased pasture land to plaintiffs for the purpose of pasturing cattle thereon and defendants sprayed poison to kill grasshoppers on their own alfalfa field adjacent to the pasture. The evidence showed that "some of the poison was found in chunks and sufficiently near the fence to enable cows in the pasture to reach it." When some of the tenants' cows died from the grasshopper poison the tenants sued the landlady and her son who was her farm manager. The opinion holds the trial court was right in refusing to direct the verdict for defendants, stating at page 177 of 158 Kan., page 377 of 146 P.2d:

"He [the son] contends he was under no duty to notify appellees [tenants] the poison had been scattered in the alfalfa field when it was scattered in a proper way. Whether the poison was properly scattered and whether adequate diligence was exercised in keeping it out of the reach of appellees' stock were questions of fact for the determination of the jury. If the poison was scattered in lumps and was washed down the slope to the pasture fence appellees were entitled to be notified of that fact by appellants in order that they might protect their stock against the unknown and hidden danger until appellants could remove it. These were all matters to be submitted to the jury under proper instructions."

We are of the opinion that the evidence was sufficient without testimony that the spray reached the grove rented by plain-

tiff. The city rented the land to plaintiff for the express purpose of keeping bees. The city knew the bees would not be confined to this three-acre plot it rented to plaintiff. The city knew, as do all persons, that it would be impossible to confine bees without destroying their usefulness as honey-producing insects. The city knew the bees would work out of the apiary and onto the adjoining fields. When the city, as plaintiff's landlord, sprayed a poison that would kill bees on the land adjoining the plot without at least notice to plaintiff it should have foreseen the ensuing damage to plaintiff. Unless the city is immunized against such an action based upon negligence, because its actions were in the performance of a governmental function, it should respond in damages.

II. One further ground of the motion that is argued is that the evidence shows plaintiff was guilty of contributory negligence as a matter of law. We hold this issue was for the jury. There is nothing in the record to show plaintiff had been forewarned that the city was going to spray chlordane. Plaintiff testified that the first knowledge that he had that the city was spraying was when the bees were dying. He testified if he had known of the city's intention to spray he could have removed the bees to another locality. The record shows he operated three hundred fifty colonies of bees located in other localities.

III. We come now to the question of whether the city was acting in a governmental or proprietary capacity. The trial court held "the operation of the air base was a governmental function." We can concur in this holding, but such a ruling does not demand setting aside the verdict. This court has expressly held that a city in the operation of a municipal airport is engaged in a governmental function. Abbott v. City of Des Moines, 230 Iowa 494, 298 N.W. 649, 138 A. L. R. 120. See also chapter 330, Code, 1950. Section 330.15, Code, 1950, provides that "any property acquired, owned, controlled, or occupied [for the purpose of an airport] shall be and is hereby declared to be acquired * * * for a public purpose and as a matter of public need, and the liability of any city or town in connection therewith shall be no greater than that imposed upon municipalities in the maintenance and operation of public parks."

1204

In Abbott v. City of Des Moines, supra, we cited many prior decisions of this court holding that a city in the operation of a public park is engaged in a governmental function. So we can take it as established that all of the property at the Sioux City air base (2283 acres) is owned, controlled and occupied for a public purpose and this includes the farm lands surrounding the runways or the so-called "approach zone."

 It is the established rule in this state and in most all other jurisdictions that a municipality, in the exercise of its purely governmental functions, is not liable for negligence. But this rule of governmental immunity is to be strictly construed. As said in 63 C. J. S., Municipal Corporations, section 746, page 33: "There has been a steady trend in the courts toward holding municipalities liable in tort."

And in New Mexico Products Co. v. New Mexico Power Co., 42 N. M. 311, 322, 77 P.2d 634, 641, it is stated: "Where there is doubt as to whether the city is liable, the question will be resolved against the municipality. 43 C. J. 932; Schultz v. Phoenix, 18 Ariz. 35, 156 P. 75; Mayor, etc. of Birmingham v. Starr, 112 Ala. 98, 20 So. 424; Pardini v. City of Reno, 50 Nev. 392, 263 P. 768."

 The trial court held the city's "farming operation" in connection with the operation of the air base was "but an incident thereto." It makes little difference whether you call the city's farming operation incidental to the air base operation or not. The defendant chose to conduct its farming operations on the airport property by leasing to tenants. This it had a right to do in furtherance of an economical administration of the municipal airport. City of Osceola v. Board of Equalization, 188 Iowa 278, 176 N.W. 284. Perhaps it had a right to lease the farm land under section 416.108, Code, 1950, giving cities the right to lease city-owned property when "any such property may not be needed for the immediate use of such city." It would seem the city would have the right to lease any property not required for municipal purposes, in the absence of express statutory authority. 63 C. J. S., Municipal Corporations, section 964, and 64 C. J. S., Municipal Corporations, section 1809.

The record shows the necessity for acquiring farm land surrounding the runways is to provide a safe approach zone free from the obstructions of high wires and buildings. Then too,

since this is an area of low altitude flying the city would be required to take that area of land where necessary low level flight would interfere with a private owner's then existing use or be dangerous to persons or property lawfully on the land. 2 C. J. S., Aerial Navigation, sections 4 and 5; Delta Air Corp. v. Kersey, 193 Ga. 862, 20 S.E.2d 245, 140 A. L. R. 1352. It is the air space and not the earth in the approach zone that is used for the purpose of an airport. This left the city free to devote the land beneath the air space, not immediately needed for the purpose of the airport, to another use. The city could rent this land, derive revenue therefrom, and thereby cut the deficit for the operation of the airport with a resulting lessening of the tax burden, but in renting for revenue the city was functioning in its proprietary capacity.

The city cannot accept and exercise the special privilege of leasing its property to tenants without assuming the responsibilities and liabilities flowing from that relationship. Surely the city in its capacity as landlord has the same duty all landlords assume, namely, to exercise ordinary care so as not to injure a tenant in the occupancy of the leased premises. When renting the land the city was acting in a proprietary capacity. A good example of twofold actions, one proprietary and one governmental, performed by a city, is present in a city's operation of a municipal electric light plant. We held in Miller v. Incorporated Town of Milford, 224 Iowa 753, 276 N.W. 826, 114 A. L. R. 1423, that in exercising its power to light the streets the city was acting in its governmental capacity, but in exercising its power to sell electricity to private consumers it was acting in its proprietary capacity.

In Incorporated Town v. Ocheyedan Elec. Co., 194 Iowa 950, 187 N.W. 560, we held that a city selling the product of its municipal electric plant to a consumer outside the city (where ordinance rates would not apply) could sell at any agreed rate but the city was bound by a contract for such sale in the absence of fraud, abuse or excess of authority.

In Arkansas Valley Compress & Warehouse Co. v. Morgan, 217 Ark. 161, 173, 229 S.W.2d 133, 140, one question involved was whether the city was acting in a governmental or proprietary ca-

pacity when it leased Building No. 19, located on its municipal airport, to a manufacturing concern. The court held:

"In the case at bar the City of Little Rock, in its dealings concerning Building No. 19, was acting in a proprietary rather than a governmental capacity. * * * the clear effect of all of our cases is that when a situation exists, as in the case at bar, the City, in leasing a building and collecting rent, acts in a proprietary and not a governmental capacity.

"When a city makes contracts in its proprietary capacity, the city is bound the same as any private corporation or citizen would be. In Town of Searcy v. Yarnell [47 Ark. 269, 1 S.W.-319, 320], we quoted from Bailey v. Mayor of New York, 3 Hill 531, 38 Am. Dec. 669: 'Powers granted for private advantages, though the public may also derive benefit therefrom, are to be regarded as exercised by the municipality as a private corporation.'"

In 63 C. J. S., Municipal Corporations, section 896, page 302, this is stated as the general rule: "A municipal corporation holding property for profit, or deriving an income therefrom, is liable for negligence in the management of the property to the same extent that individuals and business corporations are liable."

■ There is nothing in the statute, section 330.15, Code, 1950, previously quoted, which demands a holding that the city was acting in a governmental capacity when leasing the airport property. The statute states the city's control and occupancy for the purpose of an airport shall be for a public purpose and the liability "in connection therewith" shall be no greater than the public park liability. The statute immunizes negligence in connection with the use of the property for the purpose of an airport. The farm land was not used for the purpose of an airport. The navigable air space above the farm land surface was all that the city used for an airport.

■ Some idea of the magnitude of the city's renting operations at the air base is gained from the record in this case. This air base was taken over from the Federal Government. There are a number of homes and other buildings on the air base property. The manager testified: "We have approximately 350 tenants of every type, from storage to housing." To hold the city was entitled to immunity from liability to all its tenants arising from

acts of negligence that resulted in damages to them in their possession and use of the premises they rented would be giving the city immunity from liability while invading the leased property rights from which it derived revenue. We hold the city was engaged in its proprietary capacity when renting the air base property to plaintiff and as such it had the liability arising from the landlord-and-tenant relationship, including liability for negligent acts that damaged plaintiff in his use of the leased acreage. This means that the court's ruling on the motion for judgment should be reversed and the verdict reinstated. But we cannot order the judgment on the verdict for it appears there was a motion for new trial by defendant which has not been ruled upon. Paltey v. Egan, supra, 200 N. Y. 83, 93 N.E. 267.

■ The ruling of the trial court is reversed and the jury's verdict is reinstated, and the cause is remanded for ruling on the motion for new trial, and, in the event the latter motion is overruled, for judgment on the verdict.—Reversed and remanded.

All JUSTICES concur.