## Richmond

CITY OF RICHMOND v. WILBUR R. GRIZZARD, JR., AN INFANT, ETC.

June 15, 1964.

Record No. 5745.

Present, All the Justices.

*James A. Eichner, Assistant City Attorney (J. E. Drinard, City Attorney,* on brief), for the plaintiff in error.

*T. Wilson Hotze, Jr. (Robert J. Heberle; Joseph S. Bambacus; Heberle & Bambacus,* on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Wilbur R. Grizzard, Jr., who sued by his father and next friend, instituted this action against the city of Richmond, Virginia, to recover damages for personal injuries. In his motion for judgment, he alleged that the city of Richmond, hereinafter called city, negligently installed and maintained a fire extinguisher in a building owned by it; that while the building was occupied by the Broad Street Methodist Church, hereinafter referred to as church, and used for religious activities, he entered to attend his Sunday School class; and that he was injured when the fire extinguisher fell off the wall and struck him.

The city demurred on the grounds that there was no occupancy of the building by the city on the date of plaintiff's injury; that no invitation extended from the city to the plaintiff to enter the said building; and there was no evidence showing that it "was not operated by the city in a governmental capacity." The demurrer was overruled. At the conclusion of the evidence, the court overruled the city's motion to strike; the jury returned a verdict of $1,100.00 in favor of the plaintiff; and the court overruled the motion of the city to set it aside. Objection was duly noted by the city to each ruling.

On appeal the city asks us to reverse the judgment on the grounds that in using the building for offices of its Department of Public Welfare, it was engaged in a governmental function; that plaintiff was not an invitee; and that there was not sufficient evidence of negligence to present a jury question.

For many years the building involved, adjoining the Broad Street Methodist Church in Richmond, and known as its "annex" building, had been owned by the church. Space in the annex had been leased to the city for use by its Department of Public Welfare. In the most recent lease, dated July 1, 1959, the church leased certain spaces

for the exclusive use of the city, reserved certain other spaces for the exclusive use of the church, and leased still other spaces for use by the Department of Public Welfare on week days, reserving the latter spaces for church use on Sundays.

The city acquired title to the church property in a condemnation suit. The terms and consideration for its acquisition were negotiated and fixed in a written agreement dated July 6, 1960, obviously to avoid a further contest in the legal proceedings. This agreement provided that the city should make a cash payment of $435, 604.77 to the church, and that the church should have the "right to use and occupy" the church building and certain described areas and spaces in the annex for eighteen months, from the date of the distribution of the purchase money, for "religious worship and other purposes" connected therewith or incident thereto, to the same extent as existed under the July 1, 1959 lease between the parties. It was further covenanted that the city would "at its cost and expense maintain the annex in reasonably good order and repair," and "make all repairs thereto or replacements thereof as are necessary or required for the use of the areas and space therein at the times and for the purposes set out in the aforesaid lease."

Wilbur R. Grizzard, Jr., a sixteen-year-old boy, was injured on the morning of Sunday, May 21, 1961, while he was in the corridor or hallway in the basement floor of this building owned by the city of Richmond. He was on his way to attend his Sunday School class in the building. He said that as he moved aside to let an elderly lady pass, his "coat sleeve barely brushed up against a fire extinguisher hung on the wall" of the corridor; and the extinguisher fell, hit and seriously injured his right foot. The corridor was customarily and necessarily used on Sundays by persons attending the church and its Sunday School, and on week days by employees of the city, going to and from offices of the Department of Public Welfare of the city on the upper floors.

Wilmer M. Stubbs, office manager for the social service bureau of the Department of Public Welfare of the city, said that some of the extinguishers in the annex building were installed in the spring of 1958 when the building was owned by the church, but he could not identify them. John M. Coffman, chief of the Division of Buildings Management for the city, said he did not know who installed the extinguishers in the annex, and could not find out from city employees. Stuart B. Nichols, who had a contract with the city for the installation and servicing of fire extinguishers in the building, testi-

fied that between November, 1960 and May 21, 1961, he or his employees had serviced three extinguishers in the church building and annex. In answer to the question if he knew who hung the fire extinguisher involved, he said: "I don't know who actually hung the extinguisher, whether I did or someone working for me or what happened."

David Porter, sexton for the church, testified that the extinguisher in question had fallen off the wall two or three months before the accident on a week day about five o'clock in the afternoon. He said he did not replace the extinguisher on the wall; but that when he returned to the building the next day, a week day, the extinguisher had been rehung on the wall, and the only people in the building at night were employees of the city engaged in cleaning purposes.

Examination of the portion of the premises in question after the accident showed that the fallen extinguisher had been mounted on an interior corridor wall, "surfaced with plaster," by means of two No. 10 screws inserted in "Rawl plugs" anchoring a hook, and the extinguisher hung on the hook. A "Rawl plug" was described as being made of a "hard fiber with a lead core." The extinguisher was said to weigh, when filled with acid, approximately thirty-five to forty pounds. The Rawl plugs and screws were approximately one inch long. The plaster on the walls was one inch thick.

A licensed structural engineer testified that he would not consider it safe to use "Rawl plugs" to hang a fire extinguisher of such weight on a wall "surfaced with plaster."

The city knew that the building was open on Sunday for those who desired to go to church services or to the Sunday School therein maintained, and that the corridor in the basement of the annex was a common hall for the use of all persons who were invited by the church to attend its religious services. The spaces reserved in the building for the church were occupied on May 21, 1961, for the purposes of the church. The church was entitled to use such spaces for the operation of its religious activities, and for the purpose of receiving any person whom it chose to admit.

In the conduct of religious activities, neither the city nor the church was engaged in a governmental function, nor did the city in granting to the church the right to occupy and use the building for religious purposes, perform a governmental function. While the city, through its Department of Public Welfare, operates in a governmental capacity, it was here using only a part of the building at specified times for such purposes. The areas occupied by the church

at the time of the accident were wholly unrelated to governmental operation.

Here, as we have seen, a part of the consideration of the acquisition of the church property by the city was the right granted the church to use the building for its religious purposes. The city manifestly thought that negotiated agreement was preferable to continued litigation. The result was that there became an ownership of land on the one hand and an occupation by permission on the other. Moreover, there was consideration for the permission evidenced by the said agreement. Under these circumstances, the relationship of landlord and tenant ordinarily exists. *Hanks* v. *Price*, 32 Gratt. (73 Va.) 107; 51 C. J. S., Landlord and Tenant, § 10, page 517; and 52 C. J. S., Landlord and Tenant, § 417 b (2), page 29.

See *Brown* v. *Sioux City*, 242 Iowa 1196, 49 N. W. 2d 853; *Douglas* v. *Hollis*, 86 N. H. 578, 172 A. 433; *Little* v. *Holyoke*, 177 Mass. 114, 58 N. E. 170; *Bell* v. *Pittsburgh*, 297 Pa. 185, 146 A. 567, 568, 64 A. L. R. 1542.

█ The premises were thrown open to the public by the city, the owner, and by the church, the tenant, and the plaintiff was lawfully on the premises with the consent of each. He entered thereon pursuant to the purposes for which the premises were thrown open. He was not a trespasser, not a mere licensee, but an invitee on premises retained within the city's control.

There is considerable conflict of authority as to what is necessary to constitute one an invitee. While there is no reported case in Virginia involving the specific facts present here, a review of our decisions discloses that we have held one to be an invitee: (1) Where there is an express invitation to the visitor. *Richmond & M. Ry.* v. *Moore's Adm'r*, 94 Va. 493, 27 S. E. 70. (2) Where the status depends upon an implied situation the visitor is an invitee, if the premises are thrown open to the public and the visitor enters pursuant to the purposes for which they are open. See *Comess* v. *Norfolk General Hospital, Inc.*, 189 Va. 229, 52 S. E. 2d 125; *Richmond Bridge Corp.* v. *Priddy*, 167 Va. 114, 187 S. E. 518; *Hospital of St. Vincent of Paul* v. *Thompson*, 116 Va. 101, 81 S. E. 13; *Nichols' Adm'r* v. *W. O. & W. R. R. Co.*, 83 Va. 99, 5 S. E. 171; Note on "Invitee Status in Virginia," 44 Virginia Law Review, 804, 810.

Applying the second mentioned rule to the facts in the case, clearly places the plaintiff in the status of an invitee upon the premises at the time of the accident.

In *Revell* v. *Deegan*, 192 Va. 428, 433, 65 S. E. 2d 543, we said:

"A landlord who rents out parts of a building to various tenants, reserving the halls, stairways, and other approaches for the common use of his tenants, is under an implied duty to use ordinary care to keep such places in a reasonably safe condition, and is liable for injuries to persons lawfully using those places for failure to perform that duty. *Williamson* v. *Wellman*, 156 Va. 417, 425, 158 S. E. 777; 32 Am. Jur., Landlord and Tenant § 688, p. 561 ff."

In Restatement of the Law of Torts, § 360, page 976, this is said:

"A possessor of land, who leases a part thereof and retains in his own possession any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sub-lessee for bodily harm caused to them by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe."

In Comment (e) of § 360, on pages 979 and 980, the author further says:

"If the terms of the lease entitle the lessee to permit third persons to come upon the part of the land retained within the lessor's control, it is immaterial whether they come as business visitors of the lessee or as his gratuitous licensees. It is the lessor's business, as such, to afford his lessee facilities for receiving all persons whom he chooses to admit for any legitimate purpose. Therefore, a person who, as between himself and the lessee, is a gratuitous licensee, enters the land on a matter directly connected with the business of the lessor. He is, therefore, entitled to expect that the lessor will exercise reasonable care to discover and remedy any condition which makes his acceptance of the lessee's license dangerous to him."

See also 52 C. J. S., Landlord and Tenant, § 417 b (2), *supra*, and cases cited.

This brings us to the question of the sufficiency of the evidence to warrant the verdict of the jury. There was ample evidence that the fire extinguisher in question had not been properly installed on the wall before the accident. It will be remembered that the sexton of the church said that when it had fallen two or three months before May 21, 1961, he had left it on the floor; and that between the time of his departure on that day and the next morning, the only persons in the building were employees of the city engaged in

cleaning up the premises. On the following day, he noticed that the contents of the fire extinguisher which had been dumped on the floor had been cleaned up, and the extinguisher again hung on the wall.

Other witnesses stated that, as employees of the city, it was their duty to install and service the fire extinguishers in the buildings of the city. There was ample evidence that it was the duty of the city employees to service the extinguishers; that a reasonably careful examination of the manner in which the extinguisher was hung on the wall would have disclosed the dangerous condition existing; and that the city knew, or, in the exercise of reasonable care, should have discovered that condition and the risk involved.

■ The city further avers that the trial court erred in admitting a photograph, Exhibit 6, showing a fire extinguisher attached to a board nailed to the wall a short distance from the point of the original installation of the extinguisher that fell, on the ground that it constituted inadmissible evidence of repairs after the accident. *Whitten v. McClelland*, 137 Va. 726, 739, 120 S. E. 146; 64 A. L. R. 2d, Annotation, "Admissibility of evidence of repairs, change of conditions or precautions taken after accident," pages 1296, 1310.

The record shows that the city objected to the introduction of the photograph when first presented. However, the court admitted it in evidence only to show the condition of the wall and the control of the wall by the city. 2 Wigmore on Evidence, 3d. Ed. § 283, page 158. Annotation, 64 A. L. R., 2d, *supra*, page 1310. The jury was specifically told that it was not to consider the manner in which the extinguisher attached to a board had been installed on the wall, as it had nothing to do with the case; and that the picture was admitted only for the purpose "of showing the way the wall looked immediately after the accident." No exception was taken to this ruling of the court. Thereafter, the city made use of the picture for its own purposes. It twice asked its witness, A. D. Bland, general foreman, city of Richmond Buildings Management, to look at the photograph, and, first, to state the condition of two particular places on the wall, and, second, how far away from the place where the fallen fire extinguisher was originally hung, did he hang a recently installed extinguisher.

Under the circumstances, we find no error in the admission of the picture in evidence.

No error has been shown in the rulings of the trial court.

While there was a joint arrangement for the use of the premises,

one governmental and the other religious, the city was not engaged in a governmental function at the time of the accident to the plaintiff. Plaintiff was an invitee on the premises with the consent of both the church and the city. There was sufficient evidence to show that the city failed to exercise reasonable care in discovering and remedying a condition which made use of the premises a dangerous and unreasonable risk.

The judgment of the trial court is affirmed.

*Affirmed.*