# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

WILLIAM HENRY REVELL v. HATTIE STIRIZ DEEGAN.

June 18, 1951.

Record No. 3780.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Louis Lee Guy* and *Clyde W. Cooper*, for the plaintiff in error.

*Rixey & Rixey* and *William G. Maupin*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

William Henry Revell, hereinafter called the plaintiff, filed an action at law in the court below against Hattie Stiriz Deegan, hereinafter referred to as the defendant, to recover damages for personal injuries alleged to have been sustained as the proximate result of the defendant's negligence.

The plaintiff alleged that he had been for several years the tenant or lessee of a second-floor apartment in a building owned by the defendant; that while descending a wooden stairway

leading from the rear porch on the second floor to the ground, which stairway was reserved by and under the control of the defendant and intended for the common use of all of the occupants of the building, he fell to the ground and was injured; and that his fall and injuries were proximately due to the negligence of the defendant, in that she had failed to maintain and keep the stairway in a reasonably safe condition.

By proper pleadings the defendant denied that she was guilty of any negligence which proximately caused the plaintiff's injuries, and averred that he had been guilty of contributory negligence.

At the conclusion of the plaintiff's evidence the defendant declined to offer any evidence and moved the court to strike the evidence on the ground that it failed to show that she was guilty of any actionable negligence and that it disclosed that the plaintiff had been guilty of contributory negligence. The motion was overruled and the case submitted to the jury which returned a verdict for the plaintiff in the sum of $10,000.

Subsequently, upon motion of the defendant, the verdict was set aside and a final judgment entered in her favor. The case is now before us on a writ of error awarded the plaintiff. The sole question involved is whether the evidence is sufficient to sustain the verdict.

Since 1946 the plaintiff, who was fifty-two years old and a longshoreman by occupation, and his wife had been tenants of one of four apartments on the second floor of the building, located at number 314 Westover avenue, in the city of Norfolk. In the rear of the building on the second floor is a porch about 10 by 4 feet in size. An uncovered wooden stairway consisting of sixteen steps leads from the rear porch to the ground. On either side of the stairway is a top handrail constructed of two pieces of 2″ by 4″ pine timbers, each about 8 feet long. The upper end of each upper handrail is nailed to one of the upright posts which support the porch roof. The lower end of each upper handrail is attached to the top of an upright post located about half way up the stairway. A lower section of the handrail extends from this post to the top of another upright post on the ground.

The stairway and rear porch are used in common by the occupants of the second-floor apartments.

The defendant, Hattie Stiriz Deegan, had owned a one-half

interest in the building since April, 1945. She acquired the other half interest under the will of her father, Charles H. Stiriz, who died some time in the year 1948.

On May 28, 1949, after the plaintiff had returned from work and had his evening meal, he went out on the street and met a friend, Jimmie Willoughby, who lived in the neighborhood. Willoughby, who had been drinking, said that he had gone to a local tavern to buy some beer but the proprietor had declined to serve him. Thereupon Willoughby gave the plaintiff the money with which the plaintiff purchased and delivered to Willoughby six or eight bottles of beer. The plaintiff and Willoughby took the beer to the plaintiff's apartment where they sat talking and drinking for a period of about three hours, or until about midnight. During this time the plaintiff says he drank two bottles of the beer while Willoughby consumed the rest. Willoughby, the plaintiff said, although not drunk, "was feeling pretty good." The plaintiff denied that he had reached even the latter stage.

The shortest way from the plaintiff's apartment to Willoughby's home was down the rear stairway and across a vacant lot to the street beyond. As a "courtesy" Revell undertook to accompany Willoughby down the stairs, while Mrs. Revell remained on the porch at the head of the stairs. These three persons were the only eyewitnesses to what then occurred.

The plaintiff says that he started down the stairs first and after he had taken "a step or two," he "took hold of" the right-hand rail which broke, throwing him off his balance; that he instinctively "reached to grab something," caught hold of Willoughby, and that together they fell from the steps to the paved yard below, a distance of some eleven or twelve feet. It is not controverted that the plaintiff sustained severe injuries as a result of the fall.

According to the plaintiff, the guide rail broke at a point opposite the second step from the top, or six steps above the central upright to which the lower end of the eight-foot rail was attached. At the time the rail broke, he said, he did not have hold of his companion, Willoughby, nor did Willoughby fall against him thereby causing the rail to break.

"What caused the rail to break?" he was asked. "I don't know," he replied. Again he was asked, "What occasion did you have for putting your weight on the rail?" to which he replied, "Well, I didn't have any occasion to put my weight on the rail."

Mrs. Revell's testimony throws little light on the situation. She said that when her husband reached the third step and while he had "hold of the banister" it broke. Although Willoughby was summoned to testify for the plaintiff he was not present at the trial.

The plaintiff further testified that although he had lived in the apartment and had made frequent use of the stairs for more than two years, he had seen no "rotten places" in the rail which appeared to be "perfectly all right."

L. J. Deegan, the husband of the defendant, was called as an adverse witness for the plaintiff. He testified that shortly after Mrs. Deegan's father (Stiriz) died, the exact time of which is not shown in the record but is conceded by both sides to have been shortly before the accident, he (Deegan) inspected the premises to see what repairs should be made. He examined the stairs, he said, and saw no evidence of any "defect" or "rottenness" in the railing. Although he observed a crack in the lower end of the rail where it was attached to the upright post, he tested the rail, "leaned on it," "pushed down on it," saw no defect therein, and was of opinion that it was "safe."

This witness further testified that he had been employed by the United States Army Engineers as a "building specialist inspector" for two years, was a graduate engineer, and had been "in the building game for thirty-five years."

Among the original exhibits before the jury, and certified to us, is a 22-inch section of the lower end of the broken rail. This section is approximately 2 inches in thickness and $2\frac{1}{4}$ inches in width. The top of the section, while weatherstained, appears to be sound. The crack, which Deegan says he saw, extends 13 inches along the bottom of the section, but the wood on both sides of it is sound.

A portion of the outward edge of the section, extending along a weathered crack, has been split off. When and how this split was made is not shown by the evidence, but it discloses that the interior of the wood immediately beneath this latter crack had rotted for about 8 inches along the center of the section. Above and below the rotted area the wood is sound. Both ends and the inner side of the section, for its entire thickness, are sound. In short, except for the small rotted area near the center, the wood in the section is sound and would undoubtedly sustain

a considerable strain, certainly such as would be expected in the normal use of a handrail.

Whether this section was broken from the upper portion of the rail at the time of the accident or subsequent thereto is not shown, but it is significant that there is no transverse break through the rotted area. On the contrary, the severance is through sound wood.

Holes in the lower end of the section show that it was attached to the upright post by four nails, one of which remains intact in the section and in good condition. When the other nails were broken from the section, whether as the result of the breaking of the rail at the time of the accident or subsequent thereto, is not shown. The wood which held the nails, although splintered as the result of the breaking of the connection, is sound.

The legal principles by which the sufficiency of the evidence is to be tested are simple and well defined. A landlord who rents out parts of a building to various tenants, reserving the halls, stairways, and other approaches for the common use of his tenants, is under an implied duty to use ordinary care to keep such places in a reasonably safe condition, and is liable for injuries to persons lawfully using those places for failure to perform that duty. *Williamson* v. *Wellman,* 156 Va. 417, 425, 158 S. E. 777; 32 Am. Jur., Landlord and Tenant, § 688, p. 561 *ff*.

Actual or constructive knowledge on the part of the landlord of the defect causing the injury is necessary to render him liable. The burden is on the injured tenant to show that the landlord knew of the defect or by the exercise of reasonable care should have known of it. It must be shown either that the landlord had knowledge of the defect or that it had been in an unsafe condition for such a length of time that he should have known of it. 32 Am. Jur., Landlord and Tenant, § 694, p. 571.

Knowledge of his agent may, of course, be imputed to the landlord.

Where a careful inspection by the landlord or his agent of the premises has failed to disclose a defect, the landlord will be thereby relieved from liability. 52 C. J. S., Landlord and Tenant, § 417-f, p. 51.

In the case before us there is no claim of any defect in the stairway other than in the handrail. The plaintiff's argument is that the evidence warrants a finding that the handrail was rotten and defective, that the defendant's husband and agent

was negligent in not discovering the defective condition when he made the inspection shortly before the accident, and that the plaintiff's fall and injuries were proximately due to the defect in the railing which the defendant's agent failed to observe.

Although the brief of the plaintiff in error makes the repeated assertion that the rail broke because of rottenness, there is no proof of this. According to the plaintiff, the rail broke when he caught hold of it, although he had no occasion to put any weight on it. When asked what caused the rail to break, his answer was, "I don't know."

According to both the plaintiff and Deegan, the defendant's husband, there was no visible sign of decay in the railing.

It is true that the plaintiff was asked by his counsel, "Will you tell the court and jury whether or not you knew that this rail was rotten before this accident?" and replied, "No, sir. I didn't know it was rotten, didn't have no idea it was rotten. From the looks of it, I thought the rail was perfectly all right."

But obviously the plaintiff's reply to this suggestive double-barreled question has little, if any, probative value on the vital issue as to whether the railing was rotten. From the context the purpose of the question and answer is to acquit the plaintiff of contributory negligence rather than to convict the defendant of negligence. Like the traditional wife-beating question and answer, the effect is left in doubt.

Although the plaintiff testified that the rail broke near the upper end, the section produced at the trial and relied upon as evidence of the cause of the break is from the opposite end of the 8-foot rail. No portion of the rail near the point where the plaintiff said the break occurred was produced, nor is there any testimony whatsoever as to its condition. Why the plaintiff was able to produce, and did produce, a section from the lower portion of the rail and failed to produce a section at or near where he says the break occurred is not explained.

While the exhibited section shows some rottenness or deterioration in the center of the rail, about an inch below the upper surface, it is sound at both ends. Indeed, the upper portion of the section, nearest the point where the plaintiff says the break occurred, is quite sound and shows no deterioration whatsoever. The condition of the lower end of the rail, then, throws no light on the condition of the opposite end where the break occurred.

But that is not all. It is perfectly apparent from an inspection of the section of the rail which is before us that despite the small rotten area near the center, it contains a sufficient amount of hard, sound material to withstand a considerable strain. Certainly, it would not give way to one who merely caught hold of it and had no "occasion" to put any weight thereon.

We have no difficulty, then, in reaching the conclusion that the evidence fails to show that the rail was rotten or defective at the point where the plaintiff said the break occurred and that his fall was proximately due to such condition.

Even if it be assumed that the rail was in a defective condition at the time of the accident, the evidence fails to show that the defendant was guilty of negligence in not discovering and remedying the defect.

The defendant owner of the property was not an insurer of the safety of the rail. She was only required to exercise ordinary care to keep it in a reasonably safe condition. At most, she would be liable only for a defect of which she had knowledge or which was discoverable by her in the exercise of ordinary care.

We have from the plaintiff himself testimony that no rotten or defective places were visible in the rail and that "it looked like a sound rail."

Moreover, Deegan, the defendant's husband and agent, an experienced engineer, who inspected the premises, testified that not only was no defect or rottenness visible "on the outside surface" of the rail, but that he tested it, leaned on it, and found it to be sufficiently strong to serve the purpose of a guide rail.

While Deegan, being the husband of the defendant, was an interested witness and his credibility was for the jury, we find nothing in the record to warrant a rejection of his testimony and a finding that he failed to make a reasonable inspection of the handrail.

Although an inspection of the exhibited section shows that the lower end is now cracked and that several of the nails had pulled loose from it, there is nothing in the evidence to indicate that this was the situation at the time of Deegan's inspection. There is nothing to indicate that the lower end of the rail was not then firmly attached to the upright and that the rail was not reasonably fit and proper for its intended use, as he said it was.

What caused the rail to break we do not know. Certainly,

in our opinion, the evidence fails to show that the break was due to a defective condition which was the result of the defendant's negligence.

For these reasons the judgment is

*Affirmed.*