## Richmond

LANGHORNE ROAD APARTMENTS, INC. v. FREDERICK J. BISSON.

October 10, 1966.

Record No. 6263.

Present, All the Justices.

*John R. Alford* and *E. Marshall Frost* for the plaintiff in error.

*Joseph R. Johnson, Jr.* for the defendant in error.

CARRICO, J., delivered the opinion of the court.

The important question presented by this appeal is: What is the liability of a landlord to a tenant who is injured as the result of a fall caused by snow and ice upon a common walkway controlled and maintained by the landlord?

The question arose when Frederick J. Bisson, the plaintiff, filed a motion for judgment against Langhorne Road Apartments, Inc., the defendant. The motion sought the recovery of damages for personal injuries sustained by the plaintiff when he slipped on some snow and ice and fell on a sidewalk controlled and maintained by the defendant for the common use of its tenants in an apartment project owned by it in the city of Lynchburg.

The plaintiff alleged in his motion for judgment that the defendant was negligent in allowing snow and ice to remain on the sidewalk, in failing to remove the snow and ice, and in negligently attempting to remove the snow and ice. The defendant, in its grounds of defense, denied any negligence on its part and asserted the contributory negligence of the plaintiff as an affirmative defense.

The issues were submitted to a jury upon instructions delineating the duty of the defendant as that of "reasonable care to remove the ice and snow from the outdoor entrance walk herewith concerned within a reasonable time after the snow had ceased falling." The jury returned a verdict in favor of the plaintiff in the sum of $15,000.00, and that award was approved by the trial court. Final judgment was entered on the verdict for the plaintiff, and the defendant was granted this writ of error.

The evidence, viewed and stated in the light most favorable to the plaintiff, the prevailing party in the court below, shows that the plaintiff, at the time of his injury on January 13, 1964, had been a tenant of the defendant for approximately five months. On January 12, it began to snow, accumulating four inches before the snowfall ceased at approximately 10 o'clock on the morning of the 13th. The temperature on the 13th did not rise above twenty-eight degrees.

At 11:30 a.m. on the 13th, the plaintiff left his apartment to report to his employment as assistant manager of a drug store in a local shopping center. He observed employees of the defendant engaged in cleaning the sidewalks in the apartment project with a snowplow and a shovel.

When the plaintiff returned home at approximately 10:30 p.m., he parked his automobile on the street in front of the building in which his apartment was located. He observed that there were spots of snow and ice on the sidewalk leading from the city street to his apartment. The sidewalk was downgrade away from the street and was lighted by a streetlight and a light on the porch of the plaintiff's apartment building; however, there were "a lot of shadows of darkness in that particular area."

The plaintiff, wearing shoes with rubber soles and heels, proceeded along the walkway, "watching where [he] was going" and being "pretty careful to avoid a fall if possible." He had traversed 50 to 60 feet of the sidewalk and was within 10 or 12 feet of his apartment when his "feet went out from under" him, resulting in the fall which caused serious injuries to his back. There was ice with "a little snow on top of the ice" in the area where the plaintiff fell.

■ The defendant first contends that it was under no duty to remove the snow and ice from the sidewalk, citing as authority for its position the so-called "Masachusetts Rule" to the effect that "In the absence of an express or implied agreement a landlord is under no obligation to remove a natural accumulation of snow and ice on common passageways or steps." *Cairns* v. *Giumentaro*, 339 Mass. 675, 162 N. E. 2d 61, 63.

The plaintiff contends, on the other hand, that the defendant was under a duty to use reasonable care to remove the snow and ice from the sidewalk within a reasonable time after the snowfall had ceased, citing as authority for his position numerous cases which are collected in an annotation in 26 A.L.R. 2d 613. Those cases stand for the proposition that, in the absence of agreement or statutory provision, "the landlord's general duty to exercise reasonable care to keep the parts of the premises retained in the landlord's control for the common use of his tenants in reasonably safe condition for the contemplated use may, in a proper situation, include the duty of removing natural accumulations of ice and snow from the common ways or structures." 26 A.L.R. 2d, at p. 616.

We have not previously been presented with the precise question now before us. In a somewhat related situation, in *Walker* v. *The Memorial Hospital*, 187 Va. 5, 13, 45 S. E. 2d 898, involving the liability of a hospital to an invitee, it was stated:

"The authorities are in substantial accord in support of the rule that a business establishment, *landlord*, carrier, or other inviter,

in the absence of unusual circumstances, is permitted to await the end of the storm and a reasonable time thereafter to remove ice and snow from an outdoor entrance walk, platform, or steps. . . ." [Emphasis added.]

Although we have not before been called upon to determine the duty of a landlord in the snow and ice type of defect, this court has frequently had before it the question of the liability of a landlord to tenants or others lawfully upon leased premises who are injured by other types of defects in those portions of the premises reserved by the landlord for the common use of his tenants. We have consistently held, with respect to such other defects, that the landlord is under an implied duty to use ordinary care to keep such reserved portions in a reasonably safe condition, for the breach of which duty the landlord is liable to one injured while putting such a reserved portion to its intended use. *Wagman* v. *Boccheciampe*, 206 Va. 412, 415, 416, 143 S. E. 2d 907; *Revell* v. *Deegan*, 192 Va. 428, 433, 65 S. E. 2d 543, 26 A.L.R. 2d 462; *Williamson* v. *Wellman*, 156 Va. 417, 423, 158 S. E. 777.

The obvious reason why the courts, in the first instance, implied a duty upon the landlord to use ordinary care to render safe the common areas was that, since he reserved and controlled such areas, he was the logical one to see that they were kept in a reasonably safe condition. Knowing the vagaries of human nature, the courts naturally concluded that if the landlord did not keep such areas safe, no one would.

We can conceive of no logical or legal reason why a landlord should be held liable for an injury caused by a defect in a common walkway resulting from negligent construction or maintenance and yet be released from liability where the injury is caused by a natural accumulation of snow and ice which is negligently permitted to remain upon the surface of the same walkway. To draw such a distinction is but to create in the law another of those strange anomalies which, once created, live on to haunt successive legal generations.

There can be no sensible basis for a rule of no liability for failure to remove natural accumulations of snow and ice from reserved common areas and a rule of liability for other types of defects in the same areas. We believe the more realistic approach to the problem is to place the dangerous condition with which we are here concerned upon the same basis as the other defects for which a landlord may be held liable if they cause injury to those lawfully upon the premises.

When this is done, it logically follows that we adopt the rule that, in the absence of agreement or statutory provision, it is the duty of the landlord to use reasonable care to remove natural accumulations of snow and ice from walkways reserved for the common use of his tenants within a reasonable time after the storm ceases.

The defendant next contends that it "performed every duty, if any, required of it." Here, the defendant points to the testimony of its employees that they used a snowplow, shovels and chemicals to remove the snow and ice from the sidewalk. The defendant says that this testimony was undisputed and that, since it "was not an insurer," it was not, as a matter of law, "required to do anything further in regard to cleaning off the snow and ice."

The defendant is correct when it says that it was not an insurer. And it is likewise true that the defendant's employees testified that they used a snowplow, shovels and chemicals on the walkway in question and that "it was clean." But the defendant is not on sound ground when it says that the testimony of its employees was undisputed. The record reveals a substantial conflict, even in the evidence presented by the defendant, upon the material issue of the measures employed, and the effectiveness thereof, in cleaning the walkway.

James Abrams, the defendant's janitor, testified that he, St. John Coleman and three or four other men started cleaning the walkways in the apartment project at 8 a.m. on January 13, well before the snowfall had ceased, and that the sidewalk leading to the plaintiff's apartment was cleaned about 10 a.m., while it was still snowing. Abrams first stated, concerning the sidewalk in dispute, that he scraped the walk with a snowplow; that the three or four other men followed him with shovels to clean the walk "where the plow won't get"; that Coleman then came along and spread chemicals where he "hadn't been able to clean it off;" and that when he, Abrams, finished scraping with the plow, he joined Coleman in spreading chemicals. Abrams also said that he and his crew returned to the sidewalk in the afternoon and that he placed more chemicals on the walk.

Later in his testimony, Abrams indicated that only he and Coleman worked on the sidewalk in question and that the three or four other men cleaned the steps and porches of the apartment buildings abutting the walk. Abrams also claimed that after he had scraped the sidewalk "it was clean" and conceded that "there was no need to . . . put down the chemicals." Abrams changed his testimony that he had spread

chemicals on the walk in the afternoon, stating that only Coleman had done so. In the end, Abrams admitted that all he remembered about the cleaning of the sidewalk was that he "went down it with the plow."

St. John Coleman, in his testimony, stated that Abrams scraped the plaintiff's sidewalk with a snowplow; that three men followed Abrams with shovels removing "snow he [had] left;" and that he, Coleman, followed with a bucket of chemicals which he spread on the walk. Coleman also stated that he and Abrams returned to the sidewalk and that "both of [them] used a bucket of chemicals," contrary to Abrams' statement that only Coleman spread chemicals in the afternoon.

The plaintiff testified that, when he left his apartment at 11:30 a.m. on January 13, he saw only two men, and not five or six as the defendant's witnesses claimed, cleaning the sidewalks in the apartment project. The plaintiff stated that one man was using a snowplow and the other a shovel and that he did not see "any chemicals put down up there before [his] fall." The plaintiff also said that he had observed the use of chemicals "in front of the store" where he was employed; that "a small bit of it will be there the next day or the day after and we have to sweep it off;" and that if "small round pellets or grains" of chemicals had been placed on his sidewalk, he would "have noticed it." The plaintiff further testified that, when he returned home from work at 10:30 p.m., there were spots of ice covered with snow all along the sidewalk, contrary to Abrams' claim that "it was clean." Finally, the plaintiff testified that, after his fall, chemicals were used when the defendant's employees cleaned "up to the front porch . . . and they never did that before."

The plaintiff's wife testified that she and her small son watched James Abrams cleaning the sidewalk in front of her apartment with a snowplow "late in the evening" on January 13 and that Abrams was the only one she saw "out there at the time." The witness further stated that she and her next-door neighbor, and not the defendant's employees, removed the snow from the front steps and the porch because "they never swept the porches off." Mrs. Bisson also stated that she did not "see any chemical of any sort . . . on any steps, walk or anything" on the afternoon of January 13.

Finally, the plaintiff's wife gave this important testimony—she stated that, *after the plaintiff's fall*, she had a conversation with James Abrams, the defendant's janitor, and that he told her he had been in-

structed that he "had better start putting chemicals down on the walkway."

Under these circumstances, a jury question was presented as to the defendant's negligence.

■ The defendant finally contends that the plaintiff, as a matter of law, assumed the risk of walking on the sidewalk and was guilty of contributory negligence, thus barring his recovery.

The defendant here argues that since the plaintiff saw the spots of ice covered with snow "all the way down the walk" and "knew it was slick," he should have taken "a less hazardous route, that is, walking in four inches of snow" or "down the edge of the sidewalk in the snow." Having failed to take the "less hazardous route," the defendant asserts, the plaintiff assumed the risk of using the walkway. The defendant also says that, because the plaintiff knew "that the walkway would be slippery," he was guilty of contributory negligence in walking on the sidewalk.

> "The defense of assumption of risk is closely associated with that of contributory negligence but is distinguishable from it. The essence of contributory negligence is carelessness, but of assumption of risk, venturousness—the voluntary assumption of a known hazard." *Shook Company v. Barksdale*, 206 Va. 45, 48, 141 S. E. 2d 738.

It cannot be said, as a matter of law, that there is anything venturous or careless about a tenant, returning home from work at 10:30 at night, some twelve hours after a snowfall has ceased, and proceeding to use the lone walkway to his apartment which his landlord later insists "was clean" as the result of its efforts to remove the snow and ice. Nor do we believe that the tenant is required to do a toe dance along the edge of the sidewalk or to step out into four inches of snow where, if he falls, his landlord will surely say he had no right to be.

The plaintiff testified that he did not leave the sidewalk and walk in the snow because "it was pretty deep over there and [he] didn't have boots." He also stated that, although he knew the sidewalk "was slick," he "was watching where [he] was going," being "pretty careful to avoid a fall if possible" and walking "a little slower than [he] normally [walked] due to the grade to the sidewalk and the fact it might be slippery."

From this testimony and all of the surrounding circumstances of

the case, it was for the jury to say whether the plaintiff assumed the risk or was guilty of contributory negligence.

The facts of this case are clearly distinguishable from those in *Ward v. Clark*, 163 Va. 770, 177 S. E. 212, upon which the defendant places great reliance to support its contention that the plaintiff was guilty of contributory negligence as a matter of law.

In the *Ward* case, the plaintiff-tenant left her apartment on her way to church. She testified that when she "went on the porch [she] was horrified to see the situation of the steps filled with ice, and the janitor was chopping the ice at the top of the steps." She asked the janitor to help her, but did not await his assistance; and, before he could reach her, she fell and broke her leg. Her apartment had a back stairway, less convenient but from which her exit from her apartment could have been readily accomplished. The trial court held the plaintiff to be guilty of contributory negligence as a matter of law, and this court affirmed that determination. The decision in that case can have no bearing here.

We are of opinion that the trial court correctly determined the duty owed by the defendant to the plaintiff and properly submitted the issues in the case to the jury. Its actions in those respects and its final judgment will, accordingly, be

*Affirmed.*