# Richmond

NATHAN S. GUMENICK, ET AL. v. UNITED STATES OF AMERICA AND EULIS REED.

January 15, 1973.

Record No. 7971.

Present, All the Justices.

*Thomas J. Harlan, Jr.; Robert G. Doumar (Doumar, Pincus, Knight & Harlan,* on brief), for plaintiffs in error.

*Herbert K. Bangel; Roger T. Williams, Assistant United States Attorney (Bangel, Bangel & Bangel,* on brief), for defendants in error.

HARRISON, J., delivered the opinion of the court.

Appellants Nathan S. Gumenick, Jerome Gumenick, Harry Grandis and Harriett Grandis appeal two judgments of the lower court, one in favor of appellee, Eulis Reed, for $650,000 and the other in favor of appellee, United States of America, for $10,440. Reed sustained permanent injuries when he fell from the second floor porch of an apartment owned and controlled by appellants as a result of their alleged failure to exercise reasonable care in maintaining the handrailing on the porch.

Although appellants made 40 assignments of error we are essentially concerned here with the questions of proximate cause, primary negligence and contributory negligence.

At the time he sustained his injuries, Eulis Reed was 44 years old. He had resided at 2517 Queen Street, Carver Home Apartments, Portsmouth, for 24 years. On Sunday, August 2, 1970, about 10:30 P. M., he visited in the second-floor apartment of Andrew Brooks. This apartment is also one of the Carver Home Apartments, owned by defendants, and is identified as 2509 Luther Road. Present at the time were Reed, Brooks and one General Washington. After talking a few minutes, and because of the heat, the men moved from the inside of the apartment to its open back porch. The men engaged in conversation there until about 12 o'clock when Reed said that he "had better get ready to go in" for he "was going to work in the morning".

All three men testified that after making this statement Reed got up and walked to the edge of the porch at or near the head of the back stairs, and that as he did this Washington said "are you going to try to give the man one tomorrow"?

Washington testified that Reed, in response to the question, "turned around and done like this, and before he got his words out, he went over backwards (indicating)". His testimony was as follows:

"Q. You indicated he did something with his right hand?
"A. He put his right hand on the bannister.
"Q. He leaned his right hand on the bannister?

"A. Yes, sir.

\* \* \*

"Q. Tell us what he did with his right hand.

"A. He put his hand on the bannister, turned around like this to look at me, and when he did he went over backwards (indicating). Before he said anything to me he went over backwards.

"Q. That is when the board broke?

"A. Yes, sir.

"Q. When that board broke, where did Reed go?

"A. Down on the ground."

On cross-examination Washington stated that he did not see Reed lean on the railing or see his body touch the railing, but that Reed put his hand on the rail as he turned around to answer his question.

Brooks testified that "Reed got up and said he was going home, and as he walked to the edge of the porch, the head of the steps there ... he turned around to say something to General, and that is when he put his right hand on the bannister and just fell over." This witness was asked:

"Q. What did Mr. Reed do?

"A. He turned around and leaned—put his right hand on the bannister. That is when he went on down.

"Q. What happened to that bannister?

"A. Well he just went on down.

"Q. Did it break?

"A. Yes, sir.

"Q. And Mr. Reed fell to the ground?

"A. Yes, sir."

Reed's explanation of how his fall occurred was as follows:

"Q. About 12 o'clock what, if anything, did you do?

"A. Well, it was getting late. I told him I had better get ready to go in. I was going to work in the morning. So I got up to the head of the stairs and Mr. Washington said: 'Are you going to try to give the man one tomorrow?' So I said, 'What did you say?' and as I said that, I stopped and I leaned my hand against the outside rail on the porch and turned in Mr. Washington Mr. Brooks' direction, and I said, 'What did you say?' again, and by that time the board gave away.

"Q. Where did you fall?

"A. Fell to the ground."

On cross-examination Reed was asked:

"Q. All right. And you placed your right hand on the rail?
"A. That is true.
"Q. You didn't put any weight on that hand at all?
"A. No more than as myself, no.
"Q. You just touched it, that's all, wasn't it?
"A. Well, by my weight.
"Q. Your normal weight, just touching it more than anything else?
"A. That is more than touching it."

Reed was reminded that in his discovery deposition, when asked if he put any weight on his hand, he had responded: "No. I just touched it. I just touched it." He was asked if he made that statement and answered, "I did, but, sir, . . . you have to touch it in order to lean, not being offensive, sir."

He was asked if he had said in his deposition that he did not put any weight on his hand, and that his body never touched the rail, and his response was: "Yes, sir. See, I am saying that today. My body never touched it. I shifted my weight."

The jury could have concluded from the evidence of Reed, Brooks and Washington that when Reed heard Washington's question and turned to respond, he placed his right hand on the rail and, using the rail for assistance, leaned, turned, shifted or pivoted, at which time the rail broke, causing Reed to lose his balance and fall to the ground. How and why he fell is a question of fact to be resolved by the jury. There is credible evidence that the fall was caused by the break or collapse of the rail.

A porch railing, although sometimes having ornamental appeal, is primarily designed and constructed for the security and protection of those who use it. The rail is intended to be grasped, leaned on and otherwise used in a reasonable manner for the aid and protection of those on a porch, or entering or exiting therefrom. Reed was using the railing for a proper purpose at the time it broke. The jury could have concluded from the testimony that Reed did in fact lean some of his weight on the railing. This was supplemented by a demonstration in court by Washington as to the manner in which Reed put

his hand on the rail and turned around. In fact, this is the only logical conclusion the jury could have reached.

At this point it is pertinent that we consider the condition of the rail and the manner in which it was maintained. The back porch from which Reed fell is open and unprotected. It serves not only the Brooks apartment but also an adjoining apartment occupied by Florine Hill. The back doors of the two apartments open on the porch, which is of wood construction and enclosed by the rail. Steps lead from the ground to this porch. The rails which enclose the porch consist of a top rail approximately 36 inches from the floor and a second rail located approximately midway between the top rail and the floor. The rails are 2 inches by 4 inches, in sections approximately 39 inches long, and are nailed to posts that are 4 inches by 4 inches. There are no bannisters or spokes between the top rail and the mid-rail or between the mid-rail and the floor.

To show the condition of the rail, Reed called P. S. Trant, an engineer who is the Portsmouth building inspector; Glenn Yates, an architect; James L. Smith, Jr., an engineer and building contractor; and Jennings F. Phelps, who is in charge of the maintenance of defendants' Carver Homes Apartments. Defendants' expert was Dr. M. S. Hudson, a plant chemist and an expert in wood products.

It was established that this rail was of untreated common yellow pine rather than cypress, fir, heart material of some description or pressure treated wood. Smith testified that common pine should not be used on an unprotected porch "because from a wetting and drying it will rot in a very short length of time". In his opinion the rail "lost its usefulness more than two years ago, at least two years ago". The rail was attached at each end by three 16-penny nails. It broke at a point approximately 15 inches from its west post. The 15-inch segment of the rail remained attached to the west post after Reed's fall. The longer segment of the rail, approximately 24 inches, was torn off and fell or was carried to the ground by Reed. Left standing in the east post were two of the nails and a toenail that attached the broken rail thereto.

The long segment of the rail was introduced in evidence and reflects its decayed or rotten condition at the point where it broke. Trant testified that the piece was "powdery", "rotten all the way out", "the rot is nearly a hundred percent".

Yates said that he found the wood to be in a state of decay, crumbling and deteriorating in his fingers upon the application of very little pressure. In his opinion little upward pressure was re-

quired to "pull the rail off quite easily". He found the strength characteristics almost totally gone in the end of the wood which broke and pulled loose, and a "fantastic" amount of rot where the break occurred. Yates further gave as his opinion that the railing was "in a state of ill repair and should have been replaced". Testifying with reference to the place where the rail broke he said "I think it would take a little bit of pressure to break at that point".

Smith described the rail as "rotten", "had no strength to resist a horizontal thrust" and said the rail had "lost its usefulness more than two years ago". His conclusion was that the rail had "deteriorated and rotted to a point of no appreciable strength".

Defendants' maintenance man, Phelps, testified that the railing had outlived its life and should have been replaced. He said it was deteriorated and unsafe.

Appellants rely strongly on the testimony of their expert, Dr. Hudson, and an experiment which he conducted on the remnant of the broken rail. His conclusion was that the rail was 70% sound and would have held at least 100 pounds of weight. It was demonstrated that a 6-foot 2-inch man, weighing 180 pounds and leaning at an angle of 45°, supported by his hand placed on the board, did not cause it to break, and the force thus applied to the board was shown to equal 57-59 pounds of weight. This testimony was designed to show that Reed, by merely putting his hand on the rail, would not have applied sufficient pressure to have caused the break.

Notwithstanding Dr. Hudson's testimony, the fact is the rail did break under whatever pressure Reed applied and at the point of the break its decayed and rotted condition is not only obvious to the eye but was testified to by a number of reputable witnesses, including appellants' own maintenance man.

It is not controverted that the defect in this railing was a latent defect. No witness testified that its deteriorated condition had been observed by anyone prior to Reed's accident. Neither Brooks nor Mrs. Hill, both of whom used this porch constantly, had observed the defect in the rail. Brooks said that he had not "paid it no mind, no more than just—you couldn't tell it was rotten or nothing by looking at it like that ... It was some paint on it". Trant testified that "I don't think unless a person who is looking for it, and a person using it everyday, would notice it, but a person, a carpenter or an inspector or somebody who is dealing with this kind of work would recognize it".

It was the duty of appellants to maintain the porch and the railings thereon of the Brooks apartment in a reasonable state of repair. In the exercise of reasonable care appellants and their agents had full authority and the duty to make reasonable inspections of the premises and to make needed repairs. If in the exercise of ordinary care the appellant landlords could have discovered the defective condition of the rail in time to have repaired it or replaced the defective rail prior to the occasion of plaintiff's fall and injury they should have done so.[1] *Taylor* v. *Virginia Construction Corp.*, 209 Va. 76, 161 S. E. 2d 732 (1968); *Wagman* v. *Boccheciampe*, 206 Va. 412, 143 S. E. 2d 907 (1965); *Revell* v. *Deegan*, 192 Va. 428, 65 S. E. 2d 543 (1951); *Williamson* v. *Wellman*, 156 Va. 417, 158 S. E. 777 (1931).

The evidence of the experts who testified is that a proper inspection of the rail would have necessitated sounding or tapping it, probing it with a sharp instrument and testing it for movement. No such inspection was ever conducted by Phelps or anyone else for appellants. Phelps admitted that he never inspected Brooks' porch by sounding the rail or striking a sharp object into it. He never looked at, examined or inspected this particular rail, other than a possible observation of it on January 22, 1969 when he replaced another broken rail on the same porch at the request of a tenant. Phelps admitted that he had been on the premises several times in 1969 and in 1970 but at no time noticed the rail. Apparently it was the custom of appellants' maintenance men to make repairs upon notification by a tenant that some work needed to be done or other repairs made.

On redirect examination, referring to the broken rail, Phelps was asked: "Has that particular piece of wood outlived its life, the pine?"

---

[1] In the trial court's instruction "A" the jury was told that the defendants owed the plaintiff the duty to use reasonable care;

"1. To keep such place [back porch and back stairway] in a reasonably safe condition:

"2. To correct or repair within a reasonable time any defective condition in or on such porch which was known to the defendants, or which had existed for such a length of time that the defendants in the exercise of reasonable care should have known of it."

Instruction "13", requested by the defendants and granted, reads as follows:

"The Court instructs the jury that the duty upon the defendants to maintain the premises as set forth in a previous instruction of this Court includes the duty to make reasonable inspections of the premises. If you believe from a preponderance of the evidence that a reasonable inspection of the rail where the plaintiff fell would have revealed that the rail was not in such condition as to require replacement or repair, then you shall find your verdict for the defendants."

He responded "Yes. Of course, that piece of wood, if you happen to see it on a porch, why, you would knock it off and put on a new piece, yes". He was then asked if a proper inspection would have disclosed that the piece of wood was not fit for its intended purpose, and he said "Yes, I just got through telling you that it was".

There is ample evidence in the record upon which the jury could have found that appellants did not maintain the rail in a reasonable state of repair, and did not exercise ordinary care in inspecting the railing to determine its condition.

■ Appellants contend that the court erred in not granting them an instruction submitting to the jury the issue of contributory negligence on the part of Reed. In support of their argument they say that Reed: (1) was under the influence of alcohol at the time of the accident; (2) was seen staggering on the porch; (3) was an habitual absentee from his job; and (4) was arguing and cursing on the porch. And further, if the rail was in such deplorable condition and so "fantastically" rotted, Reed should have observed it or had knowledge thereof since he had visited the premises prior thereto and lived in the same area in one of the Carver apartments.

There is no evidence that Reed was under the influence of alcohol on the night of the accident. He, Brooks and Washington testified that they had not been drinking. Dale Cox, a technician who x-rayed Reed in the hospital shortly after he was injured, testified that he detected an odor of alcohol on Reed. Three doctors and a registered nurse who examined and treated Reed when he was admitted to the hospital testified unequivocally that Reed had no odor of alcohol about him. However, even if we assume the correctness of Cox's testimony ". . . the mere odor of alcohol on one's breath presents no question of intoxication for the determination of the jury". *Hill* v. *Lee*, 209 Va. 569, 572, 166 S. E. 2d 274, 276 (1969).

Appellants argue that Reed missed 50 days from work between August 4, 1969 and July 24, 1970 and that somehow this record establishes excessive drinking followed by a hangover and absence from work. Absence from work is no proof of drunkenness for it occurs for numerous reasons, some perhaps valid and some perhaps not. However, in the instant case the evidence is that for the year prior to his injury Reed had earned $4,773.94 as an employee of Columbia Yacht Corporation and an additional amount of approximately $1,000 working weekends for Parker's Open Air Market.

For proof of their allegation that Reed and his companions were

arguing, staggering and using profanity, appellants rely on the testimony of one Lillie M. Lancaster, who occupies a first-floor apartment directly across the court from the Brooks apartment. On the night of August 2, 1970 she observed the men on the porch and heard them talking. She said that they were "talking loud". During the course of their talking she overheard Washington say "Damn that man". That was the only remark that she could understand. At one time she observed them standing and talking and she saw Washington "pointing his finger". She said Reed was "standing there just like someone trying to listen to what he was saying. If he said anything, I could not hear him because he talks low". Mrs. Lancaster was reminded that when her discovery deposition was taken she had answered in response to the question "How did they act": "They acted like they had some—had kind of staggering like on the porch". Queried as to her recollection of that response she then said: "Well, they did act kind of funny, but they won't too bad." The evidence shows that Mrs. Lancaster observed the men for only a few minutes during the 1 1/2 hours they conversed on Brooks' porch.

There is no evidence that Reed had any familiarity with the back porch of Brooks' apartment or had any knowledge of the condition of the handrail around this porch. He was not a frequent visitor there, although Mrs. Lancaster testified that she had seen him use the back porch on prior occasions. While the Carver Home Apartments might not be new, modern or especially desirable, the evidence does not show their condition to be such that every tenant occupying an apartment in the complex would be charged with knowledge of the defects in all other apartments and held to use them at his or her risk.

The trial court ruled correctly that appellants were not entitled to an instruction on contributory negligence. Such negligence was not proved by the appellants and was not disclosed by appellee's evidence.

Appellants complain that the appellees had the burden of proof to show that the appellants "fell below the standard of reasonable care as used in the industry, the industry being rental of apartments, provided, of course, that that standard itself was reasonable". They say that Reed failed to establish the custom and usage of the industry in Portsmouth with regard to both the frequency and manner of inspection and that they should not have been precluded from introducing the testimony of such custom.

The duty to use reasonable care in maintaining a building encompasses the duty to make reasonable inspections to determine if and

when repairs are needed. Whether or not reasonable care was used in making inspections depends upon the facts and circumstances in each case and upon the evidence adduced. The fact that there are or may be landlords in Portsmouth who never inspect premises that they lease, or who make inspections annually, monthly or weekly, is not relevant to this case. The issue here is whether under the facts and circumstances of this case the appellants maintained the premises occupied by Brooks in a reasonable state of repair, and whether or not these specific premises were inspected at such times and with such frequency as were reasonably necessary to disclose needed repairs or replacements. The trial court properly excluded evidence as to the custom or standard used by lessors of other rental property in Portsmouth.

■ Appellants contend that the appellees injected the issue of insurance in the case and that this constitutes reversible error. Barbara Coner, a registered nurse, was on duty in the emergency room of Maryview Hospital the night Reed was injured and saw him at that time. On March 19, 1971 her discovery deposition was taken, during which counsel for the appellants asked Mrs. Coner if she had previously talked to Mr. Bangel, counsel for Reed. In responding to this question, Mrs. Coner explained that the hospital administrator told her that since Bangel represented Reed, if a representative from the insurance company desired to discuss the case with her, she should first contact Reed's attorney. She further said that she did call Bangel and that he told her if the insurance company had a letter from Reed giving her permission to discuss the case it would be all right for her to do so. She then said "that is exactly what I told the insurance people over the telephone".

During the trial in the court below, Mrs. Coner was asked by counsel for appellants if she remembered giving her deposition on March 19, 1971 and again asked if prior thereto she had been interviewed by Mr. Bangel. She responded affirmatively and admitted that when Bangel interviewed her she had looked at her nurse's notes and the chart to refresh her memory, but that she did not discuss the chart with Mr. Bangel. She was then asked: "You said nothing else to Mr. Bangel, I take it, about your impression or recollection of the occasion?", to which she responded: "I answered any questions that he asked me, just like I answered yours the day of the deposition". Counsel pursued the matter: "I am sure. Prior to refreshing your recollection of the chart, did you have an independent recollection of this patient?" She answered: "Yes, sir. When the

man from your insurance company—I take it it is your insurance company. I have no idea." The trial court said "disregard that entirely". In overruling appellants' motion for a mistrial because of this testimony, the trial court said:

> "Now, it seems to me that since a discovery deposition was taken and the same type of questions were asked at that time and it provoked an answer that she had discussed it with an insurance agent, that counsel somewhat invited this answer.

> "Consequently, I don't think there has been any harm done in this case and I will instruct the jury to disregard any mention at all of it, but to try this case here according to the evidence heard between these parties, and no one else is to be considered."

Appellants also complain that just prior to resting his case "plaintiff's counsel stood up, walked in front of the jury and called for Nathan and then Jerome Gumenick as adverse witnesses. He then asked the bailiff to call for Mr. Grandis". They say counsel knew the defendants were not in court and that this was a deliberate attempt to reinforce the impression they believe was conveyed by Mrs. Coner that the plaintiff was suing not individual defendants but an insurance company. The names of these defendants were not furnished them as persons the plaintiff intended to call as witnesses and plaintiff's counsel issued no summons for their attendance in court.

Counsel for appellee responded that he felt under no obligation to summon the defendants, for they would normally be expected to attend the trial, and he was entitled to call and interrogate the defendants as adverse witnesses. When asked by the trial court if he called the defendants with knowledge that they were not there, he answered: "No, sir. I did not know whether they were here and I wanted to ask them some questions."

This exchange was an incident of the trial and observed by the trial judge. Reed was entitled to call the appellants as adverse witnesses irrespective of whether or not they had been summoned. Parties to a civil action being tried in court are customarily expected to be present. Under certain circumstances their failure to appear and testify may be the subject of comment by counsel in his argument before the court or jury. Such comment would have been permissible in the instant case. The trial judge accepted counsel's statement that he called these witnesses in good faith. Counsel for

appellee denies that he walked in front of the jury and made a grandstand play. This too was a matter that occurred in the presence of the trial judge. He obviously attached no significance to the manner in which the witnesses were called or saw no objection thereto.

We find no prejudicial error in the rulings of the trial court in respect to the mention of insurance by Mrs. Coner or the attempt to call the appellants as adverse witnesses.

While appellants claim in their assignments of error that the verdict of the jury is excessive, this assignment has not been seriously pursued, either in the briefs or in oral argument. Admittedly, the verdict is large. However, the evidence is conclusive that Reed, who at the time of the accident had a life expectancy of 26.9 years which has been reduced to 20 years, is now permanently a quadriplegic, totally incapacitated and without any control over his normal bodily functions. The testimony is that he will never work again, will require constant attention and will need nursing and medical care for the rest of his life. There is no chance of a recovery and little chance, if any, of substantial improvement. His earnings for the year immediately preceding the accident approximated $5,500. He was married at the time and had been living with his wife for 25 years. No good purpose would be served here by reviewing the extensive testimony given by the doctors and nurses, the nature of the treatment administered this man, the pain and discomfort he has suffered and will suffer, or other facts and circumstances surrounding his injuries and long confinement in the hospital. The jury concluded that an award to him of $650,000 represents the damages he has sustained and which he is entitled to recover. This verdict has the approval of the trial judge. We cannot say that it is not supported by the evidence, or is excessive as a matter of law.

The jury also awarded the United States of America the sum of $10,440 for the expenses it incurred as a result of the accident, representing the value of the medical care, treatment and hospitalization furnished Reed, a veteran of the armed forces of the United States. This claim was asserted pursuant to the "Medical Care Recovery Act", Public Law 87-693, 76 Stat. 593, 42 U. S. C. 2651 *et seq.*, and is not in controversy.

We do not discuss the assignment of appellants which questions the use of charts by counsel for appellee in the course of his argument to the jury on damages. Since the verdict here cannot be disturbed as excessive and the charts concerned the issue of damages

only, we can perceive no reversible error that was caused by their use.

The trial of this case consumed five days and was strongly contested. The record is voluminous and includes a transcript of over 1100 pages. The court granted the respective parties 17 instructions and refused 12. The law of the case is correctly embodied in these instructions. We have considered the assignments relied upon by appellants and the five questions they allege these assignments presented. We find no error that would justify a reversal of the judgment of the trial court. It plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and that substantial justice has been reached.

Accordingly, the judgments of the lower court are

*Affirmed.*