**Richmond**

## KINGS MARKETS, INC.

### v.

## JAMES ELMO YEATTS AND J.B. FOREHAND, JR., AND DONALD G. HEPPNER t/a FOREHAND AND HEPPNER PROPERTIES

September 9, 1983.

Record No. 801969.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Thomas, JJ., and Harrison, Retired Justice.

*Wm. Rosenberger, Jr.,* for appellant.

*A. David Hawkins; John R. Alford (Overbey, Overbey and Hawkins; Caskie, Frost, Hobbs & Hamblen,* on briefs), for appellees.

HARRISON, R.J., delivered the opinion of the Court.

James Elmo Yeatts has recovered a judgment for personal injuries sustained when he fell on ice and snow on the curbing in front of a building in which defendant Kings Markets, Inc. (Kings), is located in Campbell County. The building was owned by defendants J. B. Forehand, Jr., and Donald G. Heppner, t/a Forehand and Heppner Properties (Forehand), and was leased to and oper-

ated at the time by Kings for use as a grocery store. This store was one of eight located in the Waterlick Plaza Shopping Center and faced a parking lot that was used in common by Kings and other tenants and their customers.

Defendants denied that any negligence on their part caused plaintiff's injuries, alleged that Yeatts was guilty of contributory negligence, and argued that he assumed the risk of walking on the ice and snow. In a cross-claim against Forehand, Kings also alleged that it occupied the premises under a lease in which the landlord covenanted that it would maintain in a safe condition all areas used by Kings, its employees, and customers in common with others, and that it was entitled to be indemnified by Forehand for any amounts which the plaintiff might recover against it.

Upon a trial of the case, the jury was instructed on the burden of proof, the issues of negligence and contributory negligence, and the respective duties owed by Kings and by Forehand to keep the area in which the accident occurred in a reasonably safe condition with regard to any hazard caused by snow or ice. The jury returned its verdict in favor of Yeatts and Forehand, and against Kings, and assessed plaintiff's damages at $10,000. Kings' motion to set aside the verdict was overruled. Thereafter the court considered Kings' cross-claim and Forehand's grounds of defense thereto, dismissed the cross-claim, and entered final judgment in favor of the plaintiff against Kings.

The issues raised by Kings' assignments of error involve the negligence of the lessor and lessee of the property on which plaintiff slipped and fell and their respective duties owed plaintiff, plaintiff's contributory negligence and assumption of risk, and whether the lessee is entitled to indemnity from lessor.

On Thursday, January 12, 1978, snow began to fall in the Lynchburg area about 7:45 p.m. It continued through Friday, ending about 6:45 a.m. on Saturday, January 14, with an accumulation of about 5 inches. The temperature on January 14 ranged between 28° and 35° and continued low through Monday, January 16, on which date it registered 14° to 31°.

About 8 a.m. on January 14, Kings obtained the services of a man who had the necessary equipment to push the snow from the parking lot used by its customers and paid him $80 for the work he performed in clearing the area. Prior thereto, employees of Kings had cleaned the sidewalk in front of its store of snow and pushed it approximately ten feet from the sidewalk to be picked

up by the snow-removing equipment. There was testimony that about 9 a.m. on January 16, Forehand had three men spread chemicals along the sidewalk and in the area of the parking lot adjacent to the sidewalk in Waterlick Plaza.

Yeatts, a 65-year-old retired man, said that, because of severe weather conditions, he had not ventured out of his home during the weekend prior to January 16. He testified that by Monday afternoon the sun was shining, his driveway had been cleared, and the roads were clear and open to traffic. His household was "low on groceries" and he went to Kings Market where he was a regular customer. Yeatts parked in the center's parking lot. He said "there was slush where the chemicals had been put down . . . and it was a little slick but it wasn't bad at all." He proceeded from the parking lot to the sidewalk and reached it at a point in front of Airway Cleaners, approximately 100 feet from Kings. He described the sidewalk in front of Kings and the other stores as being under a canopy and "just as clear as a bone, but the minute you stepped off that curb you was in nothing but ice and slush." Yeatts said that the icy area along the curb was about 4 inches high and that ice and slush extended "from one end of the shopping center to the other."

After making his purchases, Yeatts left Kings, accompanied by a "bag-boy", Billy Edwards, who was pushing Yeatts' grocery cart. Edwards pushed the cart down a ramp directly in front of the store. Yeatts said that the sloping ramp "was just as icy as it could be," and he did not follow Edwards but grasped a support pole to the left of the ramp. He said he then stepped out where there was some slush, and when he did he "got on the ice, both feet slipped out from under me, and my head hit—I don't know whether it was the curb or what it was—it knocked me out, I saw white stars for a minute or two—it knocked me completely out."

Yeatts said that he grasped the pole, preliminary to stepping out from the curb onto the parking area, "to get a view of the thing, looking it over," and "I wanted to be sure where I stepped." He described conditions along the curb as being "ridiculous" and said "I knew I had to be careful." Appellee admitted that he knew he was stepping out into slush and possibly ice but testified that conditions were no better at the point where he first entered the sidewalk or at any point along the curb at the shopping center. He denied that chemicals had been applied along the curb area where he fell.

Edwards, an employee of Kings, described the icy conditions of the parking lot and the area around the shopping center, including Kings. He testified that on the day of the accident he told his superior that "it was icy there . . . and there should be some more salt thrown" on the area. He said that after his report, he thought some rock salt had been applied to the area. He said he pushed the cart with Yeatts' groceries down the ramp but that Yeatts did not follow him but "decided to step down off the curb there." He saw him fall and said that Yeatts was holding onto the pole and that when Yeatts "let go of the pole then he kind of turned around frontways approximately—that is where he stepped maybe a couple of steps, that is when his feet went out from underneath him."

Gene Williamson, manager of Kings, testified that because of the accumulation of snow and ice, he took steps early on the morning of January 14 to have the area cleared. In describing the conditions, he said: "[I]t was mainly slush from thawing and melting because the temperature was so cold." He said the area had been "scraped by the scraper" and that, in addition, he had "sent the boys out there to get the snow away from the sidewalk" so that the person operating the snow-removing equipment "could get it with the blade without tearing up the sidewalk." He admitted that "there was slush all over the parking lot and we were getting a lot of complaints, I remember that." He said that they used all the rock salt they had in the store, "which deprived the customers," and were finally forced to use table salt. Williamson also said that their customers experienced difficulty in getting out of the parking lot and that "we had to give them a push and a shove, the ones without chains."

When asked what else he did about the icy conditions, Williamson said: "Well, I had sent the boys out to try to do what we could to get the ice broke up, but it was so cold we couldn't do it." He said they had no luck in breaking the ice up with hammers and shovels because "it took so long" but that "we did it around the entrances to the store as best we could." He recalled that Billy Edwards did bring to his attention the icy conditions that existed outside. Yeatts had previously testified that Edwards told him that he had notified one of his bosses that if Kings "didn't put down some chemicals that day somebody would fall and hurt themselves."

Under well-settled principles, the verdict, approved by the trial judge, has resolved all conflicts in the testimony in favor of Yeatts, and he therefore is entitled to have the evidence viewed in the light most favorable to him. Admittedly, the weather conditions on January 12, 13, 14, 15, and 16, 1978, were deplorable. After two days of snow, Kings made an effort to clear the area so that customers could frequent its store. In doing so, it left some snow, ice, and slush in the parking lot. The evidence is that the area, for approximately five feet along the curbing in front of Kings, had not been cleared on January 16 and was icy and slushy. Kings' efforts to break up this ice formation were abandoned when it appeared the job would be too time-consuming and difficult. It took no other action to remove the ice or to scrape, chip, or shovel it away. It did apply rock and table salt until its supply of those materials was exhausted. When Yeatts left Kings, he was following a Kings employee who had his groceries in a cart. He took the route to his car which appeared as safe to him as any other route available from the sidewalk, and certainly safer than following Edwards down a slick, slanting ramp. He testified that he grasped a pole to steady himself and then stepped carefully into the slush and ice, but slipped and fell.

We are unable to say as a matter of law that under the circumstances related by plaintiff and other witnesses, Yeatts was guilty of contributory negligence. His own driveway and the streets he used to visit the grocery store were clear, and the day was sunny. He successfully negotiated his entrance from the parking lot to the store. It is a question of fact whether he was guilty of negligence in the manner in which he departed the store and attempted to return to his car.

Neither can we say as a matter of law that Kings was free of negligence. Despite the extreme weather and adverse conditions, Kings remained open for business. Customers had to enter and depart the store across a five-foot icy strip along a curb, and this posed a danger. While Kings did have someone scrape snow from the parking area on January 14, it appears that little was done by it thereafter to alleviate the icy conditions. Its supply of salt was limited and wholly inadequate to do the job. Its efforts to break up the ice with hammers and shovels were too time-consuming and arduous and were abandoned. There is little evidence that other methods to alleviate the conditions were used, such as applying sand to the critical area along the ramp. The jury found that

Kings did not use ordinary care to keep its premises in a reasonably safe condition, and the evidence supports this conclusion.

In *Apartments, Inc.* v. *Bisson*, 207 Va. 474, 150 S.E.2d 540 (1966), the issue was the liability of a landlord to a tenant injured in a fall caused by snow and ice upon a common walkway controlled and maintained by the landlord. In returning to his apartment, tenant proceeded to use "the lone walkway" rather than leave the sidewalk and walk in deep snow. We affirmed a recovery by the tenant, holding as follows:

> We have consistently held, with respect to such other defects, that the landlord is under an implied duty to use ordinary care to keep such reserved portions in a reasonably safe condition, for the breach of which duty the landlord is liable to one injured while putting such a reserved portion to its intended use.
>
> * * *
>
> There can be no sensible basis for a rule of no liability for failure to remove natural accumulations of snow and ice from reserved common areas and a rule of liability for other types of defects in the same areas. We believe the more realistic approach to the problem is to place the dangerous condition with which we are here concerned upon the same basis as the other defects for which a landlord may be held liable if they cause injury to those lawfully upon the premises. When this is done, it logically follows that we adopt the rule that, in the absence of agreement or statutory provision, it is the duty of the landlord to use reasonable care to remove natural accumulations of snow and ice from walkways reserved for the common use of his tenants within a reasonable time after the storm ceases. [Citations omitted.]

207 Va. at 477-78, 150 S.E. at 542.

In *Gottlieb* v. *Andrus*, 200 Va. 114, 104 S.E.2d 743 (1958), and *Gall* v. *Tea Company*, 202 Va. 835, 120 S.E.2d 378 (1961), recovery was denied the plaintiffs, it appearing that the dangers complained of by them were open and obvious and should have been observed by any person in the exercise of ordinary care.

In *Wynne* v. *Spainhour*, 215 Va. 16, 205 S.E.2d 634 (1974), a heavy snow had fallen in an area where defendant's place of business was located. On the day after the storm, the snow was

scraped from defendant's parking lot. Three or four days later defendant spread rock salt over the remaining scattered spots of ice twice each day. One of the applications was made three to four hours prior to plaintiff's fall in which plaintiff was injured. In fact, salt was spread on the icy spot where the fall occurred. We held there that no primary negligence on the part of defendant was shown. He acted soon after the snow fell and attempted thereafter to remove the remaining spots of ice. He did all that ordinary care required to maintain the premises in a safe condition. Further, the remaining icy spots in the lot were open and obvious, and defendant was not required to warn of their presence.

In *Paytan* v. *Rowland*, 208 Va. 24, 155 S.E.2d 36 (1967), we reversed the action of the lower court in granting summary judgment for a defendant-landlord in an action by his tenant who was injured when she fell through the back porch on the rented premises. We observed that "[a] tenant is not contributorily negligent as a matter of law when she walks across a porch that affords the only practicable access to the back yard, even though she knows the porch is in bad condition." 208 Va. at 27, 155 S.E.2d at 38. We held that the issues of negligence and contributory negligence involved questions of fact that should have been resolved by a trial of the case on its merits.

The case under review is factually different from *Ward* v. *Clark*, 163 Va. 770, 177 S.E. 212 (1934). There, a plaintiff-tenant was horrified to note that the steps which she intended to use were covered with ice which a janitor was then chopping and attempting to remove. She asked the janitor for assistance. Before he could reach her, she fell and broke her leg. The evidence showed that she could have reached her apartment by a back stairway which may have been less convenient but obviously provided her with a safer and alternative way, or that she could have awaited help from the janitor. The trial court held the plaintiff to be contributorily negligent as a matter of law, and we affirmed.

■ We find no merit in appellant's argument that Yeatts assumed the risk as a matter of law. In *Stoner* v. *Robertson, Adm'r*, 207 Va. 633, 637, 151 S.E.2d 363, 366 (1966), we pointed out that " '[t]he essence of contributory negligence is carelessness; assumption of risk, venturousness.' " We cannot hold here that Yeatts was venturesome in visiting Kings on the afternoon of January 16, 1978. As we have noted, Kings was open for business, it had made some effort to clear the snow and ice from its parking

lot and the premises it used, and it was inviting customers to park their vehicles and to enter and depart its store in the usual and customary manner. Yeatts had successfully negotiated his entrance to the store, and he had no reason to believe he could not safely exit also. Hence, we cannot say as a matter of law that he was venturesome in exiting the premises.

■ Lastly, we consider Kings' argument that it is entitled to indemnity from Forehand. It contends that it should have been permitted to proceed with a third-party action against Forehand, relying upon its lease agreement dated December 14, 1971, with Forehand, which reads, in pertinent part, as follows:

> Lessor shall maintain the parking area adjacent to the leased premises in a safe condition and shall promptly remove any accumulations of snow, ice or debris. Lessor shall maintain in safe condition all areas used by Lessee, its employees and customers, in common with others.

The question is whether the evidence shows that Kings undertook to perform Forehand's duty, both under the terms of the lease and under its common-law duty. The jury was instructed that it was Forehand's duty "to have the area of common use in the shopping center in a reasonably safe condition with regard to any hazard caused by snow or ice for persons visiting the shopping center." Additionally, the jury was told that if it believed that Kings "assumed the duty to keep the area of common use in the shopping center in a reasonably safe condition with regard to any hazard that may have resulted from snow or ice, then Kings Markets, Inc. had the duty to exercise ordinary care to have said area of common use in a reasonably safe condition for persons visiting the shopping center."

Having been so instructed, the jury obviously found that Kings did assume the duty. The trial judge agreed, holding in a memorandum opinion that "[a]s a matter of fact, the uncontradicted testimony of Kings' own employees was that Kings assumed that duty." We agree. Kings' manager, Wilkerson, said that on January 14, the snow had not been removed from the parking lot and that he employed Lee Handy to clean the lot, and paid him $80 for his labor and use of equipment.

James M. Fitzgerald, also an employee of Kings in January 1978, testified that he sent the bill for $80 to Forehand and was

reimbursed that amount. At the same time he billed Forehand, he wrote his landlord: "In the future, all snow removals at the above stores [Timberlake and Waterlick Shopping Centers] will be accomplished by your arrangement [the December 14, 1971 lease]. If the snow cannot be removed within 24 hours, then we [Kings] will have to make other arrangements." Fitzgerald was asked to explain the necessity for this letter. He responded that Forehand felt that his company could have had the parking lot cleared cheaper than Kings did, and in the future would do so. Fitzgerald said that it was important to Kings for the lot to be cleared immediately after a snow, and that he wanted it understood that if Forehand could not arrange for such clearing within 24 hours, Kings would do so.

Fitzgerald then testified to the arrangement that existed between Forehand and Kings at the time of and prior to the January 1978 snowstorm. He said the agreement they had was that in event of snow or ice, Kings would get someone to clean the parking lot at Waterlick, and it would be reimbursed by Forehand. Fitzgerald reiterated "[t]he procedure was that the store manager [of Kings] would have the lots cleaned and those [expenses] that were reimbursable, they would be paid." He observed: "It was standard procedure [for Kings] to remove the snow in the parking lot immediately. Any time we had a snowfall we always removed it immediately—if you didn't get your snow off first and the other guy did, you would lose your business."

Under no theory could Kings be regarded here as a mere gratuitous volunteer or a "good Samaritan." Aside from the duty it owed its customers to use ordinary care to keep in a reasonably safe condition the area used by them, it assumed Forehand's contractual obligation to remove snow and ice from the shopping center because it was in Kings' best economic interest to do so.

Referring again to the lease, we note that it further provides that Forehand will not be liable except for its own negligence, and that in event of a defect known to the lessee, the lessor shall not be liable unless the lessor has received, prior to damage, notice in writing of the defect and has had a reasonable opportunity, under the circumstances existing, to make such repairs. The lease further provides that Kings maintain public liability insurance to provide protection for Forehand against public liability arising out of the lease agreement or the use or ownership of the premises leased to Kings. Under these circumstances, we cannot conclude that the

agreement was intended to provide indemnity to Kings for liability resulting from Kings' acts which a jury has found to constitute negligence.

We have examined all assignments of error made by the appellant. We are of opinion that the jury was correctly instructed on the dispositive issues involved and that these issues were properly submitted to the jury. We cannot say that the verdict of the jury is without evidence to support it or that the judgment of the lower court is plainly wrong. Accordingly, the judgment will be

*Affirmed.*